UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 95 CR 508-1 |
| v. | ) | |
| | ) | Judge Harry D. Leinenweber |
| LARRY HOOVER, a/k/a "The Chairman," | ) | |
| "The King" | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT LARRY HOOVER'S
MOTION FOR RELIEF UNDER THE FIRST STEP ACT**

The United States of America, through its attorney, John R. Lausch, Jr.,

United States Attorney for the Northern District of Illinois, respectfully submits the

following response to Larry Hoover's motion for relief under the First Step Act.

Larry Hoover, pictured in the center below,[1] is one of the most notorious gang

leaders ever prosecuted in the United States.



---

[1] This photograph was admitted in evidence during the 2019 trial of Gangster Disciples leaders in the Atlanta area. *See United States v. Craig et al.*, No. 16 CR 145 (N.D. Ga.). Hoover's second in command, Gregory Shell, is pictured on the left. Keith McCain, who testified in the Atlanta trial, is pictured on the right. *See also United States v. Smith*, 223 F.3d 554 (7th Cir. 2000) (affirming McCain's conviction in this district).

Hoover's name is synonymous with crime. As Chairman of the Gangster Disciples ("GDs"), Hoover directed violence and drug trafficking in Chicago from at least 1970 until 1995, when he was charged in this case. For almost all of that time, Hoover was in state prison serving a life sentence for the murder of a lower-ranking GD that he ordered in 1973. Hoover's state incarceration did not deter or disable him from continuing to direct the gang's operations for more than two decades.

In May 1997, following a jury trial with other leaders of his gang, Hoover was convicted on all 40 counts against him in the operative superseding indictment. This Court sentenced Hoover to mandatory life imprisonment on Count 2, which charged Hoover with engaging in a continuing criminal enterprise for 25 years—from approximately 1970 until 1995. The Court imposed concurrent sentences ranging from 4 years' to life imprisonment on the remaining counts of conviction, plus a mandatory consecutive sentence of 5 years for Hoover's conviction under 18 U.S.C. § 924(c).

In affirming Hoover's conviction and sentence on direct appeal, the Seventh Circuit accurately described the GDs as "a large and vicious street gang" that sold "great quantities of cocaine, heroin, and other drugs in Chicago." *United States v. Hoover*, 246 F.3d 1054, 1056 (7th Cir. 2001). "Hoover ran the [GDs] from state prison, apparently bribing guards with cash and drugs to be allowed the freedom to do this." *Id.* at 1059. Commenting on the trial evidence, the Seventh Circuit described the taped conversations between "Hoover and his henchmen" as "evidence so crushing that the rest of the prosecution's case scarcely mattered." *Id.* at 1057.

Hoover, now 69 years old, is serving his life sentence at a maximum security federal prison known as ADX Florence, located near Florence, Colorado. Hoover's designation to ADX Florence reflects the high level of security needed to ensure that he does not succeed in leading the GDs from prison—as he did in the Illinois Department of Corrections for more than two decades.

After lobbying on Hoover's behalf failed to result in executive clemency,[2] Hoover has turned to this Court for relief. Hoover claims an entitlement to relief under the First Step Act—a criminal justice reform measure that could not have been intended to open the prison door for a violent gang leader like Hoover who was rightly sentenced to life imprisonment.

Having seen two of his high-ranking associates—William Edwards (Dkt. 1210) and Johnny Jackson (Dt. 1225)—obtain sentence reductions from this Court under the First Step Act and walk free from prison, Hoover has filed his own motion for relief. The prospect of Hoover or even more of his associates[3] obtaining relief under

---

[2] *Compare* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-kanye-west-jim-brown/ (falsely claiming "the reason why they imprisoned [Hoover] is because he started doing positive for the community") *with United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001) (noting that trial evidence "made mincemeat of [the] defense" that Hoover was merely the leader of "an organization of community activists committed to cleanup, education, political awareness, and suppression of gang and drug activities").

[3] In this case alone (95 CR 508), Hoover's second in command (Gregory Shell) and two his "governors" (Tirenzy Wilson and Jerry Strawhorn) also have First Step Act motions pending before this Court. Dkt. 1224, 1249-50. In the related prosecutions of Hoover's associates—*United States v. Keith McCain et al.*, 95 CR 509 (currently assigned to Gettleman, J.), and *United States v. Cedric Parks et al.*, 95 CR 510 (currently assigned to Bucklo, J.)—there are three additional First Step Act motions pending. In 95 CR 510, Judge Bucklo has reduced defendant Cedric Parks' sentence from life imprisonment to 360 months (Dkt. 2046-47) and defendant Harold Jackson's sentence from 360 months to time served (Dkt. 2049-50).

the First Step Act is a matter of public importance[4] because the sentences imposed in this case were critical to protecting the public and promoting respect for the law.

Nothing in the First Step Act compels the Court to grant any form of relief to Hoover or his associates. *See United States v. Shaw*, --- F.3d ---, 2020 WL 20292658, at \*1 (7th Cir. Apr. 28, 2020) (defining relevant inquiries in this context as whether court "may" reduce a defendant's sentence and whether the court "should" do so—leaving no room for the theory that a sentence reduction is ever mandatory). Indeed, Section 404(c) of the Act expressly states: "Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section." It follows that even if Hoover committed a "covered offense," as the First Step Act defines that term, he is not legally entitled to any reduction in his sentence—including under his proffered theory that the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013), must be applied to him retroactively, which is contrary to existing case law. *See e.g.*, *United States v. Yates*, 777 F. App'x 829, 830 (7th Cir. 2019) ("*Alleyne* does not apply retroactively."). In addition, the Seventh Circuit has already made clear that *Apprendi* does not apply to Hoover's life sentence for engaging in a continuing criminal enterprise because life imprisonment is a statutorily-authorized punishment for that offense even without any factual findings under 21 U.S.C. § 848(b)(2) as to drug quantity or gross proceeds. *Hoover*, 246 F.3d at 1058.

---

[4] *See e.g.*, https://chicago.suntimes.com/politics/2020/3/20/21184373/gangster-disciples-larry-hoover-prison-first-step-act-kanye-west-donald-trump (last visited May 1, 2020).

It would be the ultimate case study in unforeseen consequences to interpret the First Step Act's definition of "covered offense" to require a reduced sentence for a defendant like Larry Hoover, who directed decades of gang violence and drug trafficking. Hoover is surely not the type of defendant whom Congress had in mind when drafting and passing the First Step Act.

For the reasons stated below, the government respectfully urges the Court to deny Hoover's motion under the First Step Act. As stated in a separately filed motion (Dkt. 1245), the government also seeks to be heard at oral argument on the motions filed by Hoover and co-defendant Gregory Shell, unless the Court elects to deny those motions based on the briefs.

## I.     BACKGROUND

Hoover was born in Jackson, Mississippi in 1950. PSR ¶ 69.[5] Hoover was the older of two boys born to his biological parents, who were not married. *Id*. When Hoover was young, his mother relocated the family to Chicago, married, and had two additional children. *Id*. ¶ 70.

Hoover was raised on the south side of Chicago and reports having "pleasant memories of his childhood and adolescence." *Id*. Following a divorce, Hoover's mother became a single parent of four children and managed to meet the family's living expenses through a combination of employment and public assistance. *Id*. Hoover describes his mother as "the mainstay of the family…who taught the children the value of work, education, and respect for family and community." *Id*. Hoover did not

---

[5] At sentencing, the Court adopted the PSR's factual findings and guideline application. *See* Exhibit A (Hoover judgment) at 6.

experience or witness any violence in his childhood home. *Id*. Similarly, Hoover was raised in an environment where alcohol and drugs did not cause problems. *Id*.

According to Hoover, as the oldest child in his family, he took on a leadership role and provided support and assistance to his mother and three younger siblings. *Id*. Hoover also credits his mother with teaching him "to treat others the way you want to be treated." *Id*.

Against that backdrop, Hoover's decision to join a gang and preside over decades of violence and drug trafficking cannot be attributed to adverse factors in his childhood. Hoover is responsible for his own choices. During his adolescence in the 1960s, Hoover joined the Black P-Stone Nation. *Id*. at ¶ 81. Hoover claims he engaged in political activism as a teenager, but the record shows that he was actively engaged in gang violence—starting a pattern that lasted for decades. *Id*. By his own admission, Hoover was expelled from Francis Parker High School after shooting a gang member in front of the principal's office. *Id*. ¶ 85. By the late 1960s or early 1970s, Hoover had become a leader of the Supreme Gangsters. *Id*. ¶ 81; *see also People v. Smith*, 304 N.E.2d 50 (Ill. App. Ct. 1973) (Hoover, whose Supreme Gangsters were affiliated with the Blackstone Rangers, attended a reconciliation meeting to discuss why a member of another gang affiliated with the Blackstone Rangers had shot one of Hoover's associates in May 1969).

## A. Hoover's Murder Conviction

By 1973, "King Hoover"—as the defendant was known by then—had become the leader of an organization known as "The Family" that sold narcotics in the Englewood neighborhood of Chicago. *See People v. Hoover*, 342 N.E.2d 795, 797 (Ill. App. Ct. 1976). At a meeting of his gang, Hoover ordered the execution of William Young and other street level workers suspected of stealing from Hoover's narcotics stash houses. *Id*.

On the night of February 26, 1973, Andrew Howard—a gang member under Hoover's command—shot Young in the head six times and dumped his body in an alley. *Id*. Approximately 90 minutes after the murder, Hoover called another meeting of his gang and reported that "he had gotten one of the guys that they was [sic] after and he wanted the other two…killed also before the week was out." *Id*. at 797, 799. Another one of Hoover's targets, Joshua Shaw, was murdered several months later in September 1973. *Id*.

Following a jury trial in December 1973, Hoover and Howard were both convicted of Young's murder. The state judge sentenced Hoover to a term of 150 to 200 years' imprisonment. *Id*. 797; PSR ¶ 50. Both Hoover's and Howard's convictions were affirmed on appeal. *Id*. at 800; *see also People v. Howard*, 340 N.E.2d 53, 58 (Ill. App. Ct. 1975).

## B. History of the Gangster Disciples

Following his murder conviction, Hoover was admitted to the Illinois Department of Corrections in February 1974. PSR ¶ 50. Hoover remained in IDOC

custody from 1974 until 1995, when he was charged in this case. *Id*. During those years, Hoover was cited in 39 incident reports for violating IDOC rules. *Id*. The most significant violation documented in those reports occurred in July 1978, when Hoover incited a riot at the Pontiac Correctional Center. *Id*. (noting that Hoover was placed in segregation for one year).

Those IDOC incident reports, of course, provide only a partial window into Hoover's actions during his 20 years in state custody. As detailed below,[6] before Hoover ever went to prison, he had become the leader of a consolidated gang known as the Gangster Disciples and directed the gang's violent activities from state prison for the next two decades.

> [I]n the late 1960's…Larry Hoover and David Barksdale, the leaders of two Chicago street gangs, merged their gangs to form the Black Gangster Disciple Nation, which name was later shortened to Gangster Disciples. Hoover and Barksdale ruled the unified gang as "King Larry" and "King David." But Barksdale's shared reign ended when he was killed soon after the gangs merged.
>
> In 1973 Hoover was convicted for ordering a double murder and has been incarcerated by Illinois ever since, but astonishingly he continued to rule the Gangster Disciples from prison. Under Hoover's leadership the gang rose to prominence, controlling a large part of the street-level drug trafficking in the Chicago area. At its height in the early 1990's, the gang's drug sales brought in about $100 million per year.
>
> In the 1980's, Hoover jettisoned the old monarchical nomenclature of the gang's top leaders in favor of a more modern, corporate nomenclature. He called himself the Chairman of the Board and formed his closest allies into two Boards of Directors: an incarcerated Board for the leaders in prisons and an unincarcerated Board for the leaders on the outside. The Directors oversaw all of the gang's operations.

---

[6] The following history of the Gangster Disciples is drawn from *United States v. Irwin*, 149 F.3d 565 (7th Cir. 1998), where the Seventh Circuit affirmed the conviction of Sonia Irwin— the girlfriend of Hoover's second in command—for aiding and abetting the gang's drug conspiracy.

Below the Directors were the Governors, who were charged with running narcotics sales in specified areas throughout Chicago and its suburbs. A Governor typically had about 1,000 gang members, called Foot Soldiers, working under him. A Governor could control this many gang members because he had two more layers of leaders beneath him: the Regents, who controlled smaller areas within a Governor's territory, and Coordinators, who controlled smaller areas within a Regent's territory.

In 1990, Hoover appointed [Gregory] Shell—who was already a member of the unincarcerated Board—to second-in-command, charged with controlling the gang's activities on the outside while Hoover was in prison…

The Gangster Disciples specialized in street-level, low-price sales of small quantities of drugs. This presented two problems for the gang's leaders: the gang needed to control territory in which it could make sales, and needed to organize the actions of and collect the proceeds from the thousands of Foot Soldiers carrying on the day-today sales. (A gang-conducted census revealed that it had anywhere from 6,000 to 30,000 members selling drugs.) The Coordinators, Regents, and Governors had to control which Foot Soldier sold where to ensure that the gang did not compete for sales against itself. If there was more demand in an area than the Gangster Disciples had Foot Soldiers to supply, the gang permitted dealers unaffiliated with a gang, called "Neutrons," to sell their wares so long as they paid a tax to the Gangster Disciples. But the Gangster Disciples violently suppressed any rival gang's attempt to sell in Gangster Disciple territory.

In order to funnel proceeds from the enormous number of small sales to the gang's leaders, Hoover decided to charge each gang member certain dues, called the "count" or the "weekly." This was in effect a tax or franchise fee for doing business as a Gangster Disciple, similar to the tax levied on Neutrons. The Governors were responsible for getting the weekly in to the Directors, and Governors who owed back taxes were likely to find themselves the unwilling recipients of a beating.

Hoover also demonstrated his vision and organizational flair by forming a political action committee for the gang, called 21st Century V.O.T.E., and imposing another tax on gang members called the "political," some of the revenue from which was funneled into the PAC. The gang also sponsored music concerts, with mandatory attendance for gang members, and used the concerts to launder drug money.

In 1993, apparently dissatisfied with his profits as Chairman, Hoover developed a scheme called "One Day a Week" or "Nation Dope." One day each week, everyone selling within the gang's territory had to sell drugs for Hoover himself. Hoover estimated that this would net him $200,000 to $300,000 each week. He thought there might be some resistance to Nation Dope, so he instructed the Directors to put the word out that anyone refusing to sell Nation Dope would be shot. Hoover's analysis was simple: "One day a week ain't much to ask for your life."

Hoover knew that his phone calls in prison could be monitored, so whenever a Director began to discuss business matters on the phone, Hoover cut him off and told him to come to the prison to see Hoover in person. So the Directors had to go to whichever prison Hoover was currently in to receive their instructions.

When Hoover was eventually transferred to Illinois' Vienna facility, traveling became a hardship because Vienna is located in the southern tip of the state, about a six-hour drive from Chicago. But the Directors regularly made this trip, and Hoover had a stream of visitors. In the fall of 1993, the government got a court order permitting it to place a transmitter in the visitor badge given to gang leaders who came to see Hoover. The government was thus able to monitor the conversations of the gang's inner leadership for six weeks until the transmitter was discovered.

*United States v. Irwin*, 149 F.3d 565, 567-68 (7th Cir. 1998) (paragraph breaks modified).

As Chairman of the Gangster Disciples, Hoover exercised power in a way that rippled across other criminal prosecutions in Illinois and eventually resulted in a federal indictment in 1995. *See e.g., People v. Boclair*, 544 N.E.2d 715, 719 (Ill. 1989) (affirming defendant's conviction for murder of fellow IDOC inmate and describing trial testimony of inmate who heard discussion that "word came down from Larry Hoover, the leader of the 'whole nation,' that the victim had to be hit"); *People v. Johnson*, 620 N.E. 506 (Ill. App. Ct. 1993) (Gangster Disciple who ordered murder of

Superintendent at Pontiac Correctional Center was convicted, in part, based on incriminating statements made to a cooperator who posed as Hoover's emissary—thereby revealing the power of Hoover's name to elicit information about even the most sensitive matters, like the gang's murder of a prison official).

### C. Hoover's indictment, trial, and conviction

On August 31, 1995, a federal grand jury returned three separate indictments charging Hoover and 38 other Gangster Disciples with a conspiracy to sell narcotics and related offenses. *See United States v. Larry Hoover et al.*, 95 CR 508 (Leinenweber, J.); *United States v. Keith McCain et al.*, 95 CR 509 (Plunkett, J.); and *United States v. Cedric Parks et al.*, 95 CR 510 (Marovich, J.).[7]

In the operative 42-count superseding indictment, Hoover was charged with 40 crimes. Count 1 charged that from approximately 1970 until August 1995, Hoover conspired with other Gangster Disciples to possess with intent to distribute and distribute cocaine, cocaine base, heroin, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count 2 charged Hoover and other gang leaders with engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a). Counts 3 and 4 charged Hoover and others with employing or using minors in their drug operation, in violation of 21 U.S.C. § 861(a)(1). Counts 5, 7-9, and 15-18 charged Hoover and others with specific distributions of cocaine and cocaine base, in violation of 21 U.S.C.

---

[7] *See also United States v Wilson*, 237 F.3d 827 (7th Cir. 2001) (affirming convictions of six Gangster Disciples charged in May 1997 for "the same drug distribution conspiracy as the earlier [August 1995] indictments" plus "added charges arising out of certain events that took place after the original indictments as a result of a power struggle to fill the void left by the indictment of the original 39 leaders").

§ 841(a)(1). Counts 11-14 and 38-39 charged Hoover and others with possession and attempted possession with intent to distribute cocaine and cocaine base. Counts 10 and 19-37 charged Hoover and others with using a communication facility in furtherance of their drug conspiracy, in violation of 21 U.S.C. § 843(b). Finally, Count 40 charged Hoover and others with using or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

Starting on March 19, 1997, this Court presided over a jury trial for Hoover, his second in command Gregory Shell, and four other gang leaders. Dkt. 271. Approximately seven weeks later, on May 9, 1997, the jury found Hoover and his co-defendants guilty on all charges. Dkt. 330-333, 340-342.

### D. Hoover's sentencing

<u>Offense conduct</u>

At Hoover's sentencing in June 1998, this Court expressly adopted the "factual findings…in the presentence report." Exhibit A (Hoover judgment) at 6. By adopting the PSR, the Court found that the Gangster Disciples ("GDs") were "a south-side Chicago street gang of between 10,000 and 30,000 members. From the 1970's up until at least the date of the instant indictment, August 31, 1995, the [GDs] controlled the distribution of illegal drugs on the south side of Chicago and the south suburbs of Chicago through a hierarchical structure and set of gang rules or 'laws' which each gang member agreed to follow." PSR ¶ 13. "Huge amount of illegal drugs, mostly cocaine, were distributed down from the top ranks of the organization through the middle management to the street-level dealers." *Id*.

Regarding Hoover's leadership role in the gang, the Court made the following factual findings:

> Larry Hoover was 'The Chairman" and exercised control and decision-making authority over all aspects of the Gangster Disciples including, the establishment of geographic boundaries and territories, the development and maintenance of the rules and laws that governed the Gangster Disciples, and the punishment for members and non-members who violated the Gangster Disciples' creed and laws.

> Mr. Hoover was the chief executive officer of the organization and as such recruited individuals into the conspiracy, directed the movement of individuals in the conspiracy, determined promotions and reprimands for those in the conspiracy, and developed the operational policies for the conspiracy.

> As chief financial officer of the organization, Mr. Hoover exercised control of the income and expenditures of the organization. The cash proceeds from drug distribution were given to him or his nominees and meticulous records—including sales location, sale dates, type of drugs sold, number of individual packets sold—were tabulated and maintained.

> Mr. Hoover oversaw the expenditures of the organization including operational expenses and the purchase of motor vehicles and luxury items.

> Mr. Hoover proved himself as [sic] effective administrator in that he delegated daily operations and financial dealings to his most trusted managers while maintaining sole decision-making authority and receiving a preponderance of the profits.

*Id*. ¶¶ 14, 20 (paragraph breaks modified).

The Court found that below Hoover, "[t]he gang's hierarchy included board members, governors, assistant governors, regents, coordinators and soldiers, with decreasing levels of authority and responsibility." *Id*. ¶ 14. "Gregory Shell and Andrew Howard were board members and reported directly to Larry Hoover." As a general matter, "board members were responsible for the operations of the Gangster

13

Disciples in large geographic areas[and] were the administrators of the gang immediately below Larry Hoover[.]" *Id.* ¶ 17.

Hoover and other leaders in the gang "had the power to order violations"— meaning "violent beatings which sometimes rendered their victims hospitalized or killed." *Id.* "In order to conceal the illegal activities of the gang, members were forbidden from discussing the same with law enforcement authorities under penalty of death." *Id.*; *see also United States v. Ray*, 238 F.3d 828, 831 (7th Cir. 2001) (affirming conviction of GD enforcer who murdered a suspected cooperator and "warned other gang members that they could face the same fate…if they violated the rule against silence and secrecy"). As Chairman, Hoover was aware that the gang "utilized firearms in the commission of [its] narcotics trafficking activity" and also to "maintain discipline within the gang." *Id.*

The Court also made findings about Hoover's direct role in negotiating with narcotics supplies and profiting from the gang's drug trafficking. "The Gangster Disciples purchased powder cocaine, crack cocaine, heroin, and marijuana from suppliers…[who] dealt directly with Larry Hoover and, at his direction, the board members." *Id.* ¶ 14. "[T]he profits from the drug sales funneled back up through the ranks to Larry Hoover and his family with the gang members receiving varying degrees of monetary compensation for their work." *Id.* ¶ 15. The Court also found that recorded conversations between Hoover and other gang leaders established the existence of a plan requiring GDs to sell "nation dope, [meaning] drugs provided directly from the gang, one day per week." *Id.* "In taped conversations, Larry Hoover

admitted that one day's drug profits for the entire gang easily totaled $300,000, which translates to approximately 4.5 kilograms of crack cocaine being sold on a daily basis. At that rate, the [GDs] are estimated to have grossed $109,500,000 annually from the sale of narcotics." *Id* (noting that evidence supporting drug quantity finding included "taped conversations, videotaped recorded narcotics transaction, testimony at trial, and narcotics and income ledgers and records recovered during the government's investigation").

Each member of the gang, but particularly Hoover as Chairman, "was aware of the scope of the drug conspiracy and is accountable for the distribution of at least 150 kilograms of cocaine and 1.5 kilograms of crack cocaine," *id.* ¶ 21, which triggered the highest base offense level available under Guidelines Manual applied at sentencing.

Guidelines range

The Court grouped Counts 1-39 and calculated a base offense level of 39. *Id.* ¶¶ 30-37. The Court applied a 4-level enhancement under Guideline § 3B1.1(a) for Hoover's leadership role in the gang, *id.* ¶ 40, bringing his total offense level to 43, *id.* ¶ 42. Combined with a criminal history in Category III, *id.*, ¶ 53, Hoover's guidelines range was life imprisonment, *id.* ¶ 92.

Hoover's mandatory life sentence on Count 2

Aside from the guidelines, Hoover also faced mandatory minimum sentences on several counts of conviction. Most significantly, the Court found that Hoover was subject to a mandatory life sentence on Count 2 for engaging in a continuing criminal

enterprise, in violation of 21 U.S.C. § 848(a). Hoover's mandatory life sentence on

Count 2 was based on two statutory factors:

> Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a), if—

> (1)     such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

> (2)

>> (A)    the violation referred to in subsection (c)(1) involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title, or

>> (B)    the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in section 841(b)(1)(B) of this title.

21 U.S.C. § 848(b); *see also United States v. Jackson*, 207 F.3d 910, 920 (7th Cir. 2000)

(observing that CCE's statutory threshold of $10 million was "less than a tenth of the

annual gross receipts that the judge [Marovich, J.] could and did attribute to the

Gangster Disciples"); *cert. granted*, 531 U.S. 953 (2000) (vacated and remanded in

light of *Apprendi*); *judgment reinstated*, 236 F.3d 886 (7th Cir. 2001) (*Apprendi*

violation not prejudicial because "[n]o reasonable jury could have failed to convict

Jackson of being involved in the sale of hundreds, if not thousands, of grams of

crack").

    Based on the factual findings detailed earlier—namely, that Hoover was the

"Chairman" of a gang that sold at least 4.5 kilograms of crack per day and grossed

over $100 million per year from drug sales, PSR ¶¶ 15, 21—this Court correctly determined that Hoover was (1) one of the "principal administrators, organizers, or leaders" of a continuing criminal enterprise; and (2) that the offense involved both (i) "at least 300 times the quantity of a substance described in subsection § 841(b)(1)(B)," meaning more than 1.5 kilograms of crack cocaine; and (ii) at least "$10 million dollars in gross receipts during any twelve-month period" from drug trafficking. 21 U.S.C. § 848(b).

Accordingly, the Court sentenced Hoover to mandatory life imprisonment on Count 2. For reference, Hoover's sentences on all 40 counts of conviction are set forth below along with the applicable mandatory minimum penalties. Dkt. 451 (Hoover sentencing order).

| Count(s) | Offense | Mandatory Minimum[8] | Sentence |
|---|---|---|---|
| 1 | Drug conspiracy, 21 U.S.C. § 846 | 10 years | N/A (dismissed)[9] |
| 2 | Continuing criminal enterprise, 21 U.S.C. § 848(a) | Life | Life |
| 3-4 | Use of a minor in drug operations, 21 U.S.C. § 861(a)(1) | 20 years | Life (concurrent) |
| 5,10 7-9, 11, 14-16, 18 and 38 | Possession with intent to distribute or distribution of a controlled substance, 21 U.S.C. § 841(a)(1) | N/A | 20 years (concurrent) |
| 10, 19-37 | Use of a communication facility, 21 U.S.C. § 843(b) | N/A | 4 years (concurrent) |

---

[8] The mandatory minimum penalties that applied to Hoover are set forth in paragraphs 90 and 91 of the PSR.

[9] Because the Court found that Hoover qualified for mandatory life imprisonment on Count 2, Count 1 was considered a lesser-included offense. PSR ¶ 90.

[10] Docket 451 incorrectly states that Hoover received a concurrent sentence of 20 years' imprisonment on Count 6 even though Hoover was not charged in Count 6 of the operative superseding indictment.

| Count(s) | Offense | Mandatory Minimum[8] | Sentence |
|---|---|---|---|
| 12, 17, 39 | Possession with intent to distribute or distribution of a controlled substance, 21 U.S.C. § 841(a)(1) | 10 years | Life (concurrent) |
| 13 | Attempted possession with intent to distribute a controlled substance, 21 U.S.C. § 841(a)(1) | 5 years | 5 years[11] (concurrent) |
| 40 | Use/carrying of a firearm during/ in relation to drug trafficking 18 U.S.C. 924(c) | 5 years | 5 years (consecutive) |

### E.    Hoover's direct appeal

The Seventh Circuit affirmed Hoover's conviction on direct appeal. Among other issues, the court held that a statement admitted in violation of *Bruton v. United States*, 391 U.S. 123 (1968)—specifically, a confession by co-defendant Andrew Howard that identified Hoover and Shell as the "incarcerated leader" and "unincarcerated leader" of the gang—was harmless error because the other evidence against Hoover was overwhelming.

> The tapes scuttled Hoover's defense. Howard's words could not have mattered to the jury's consideration of the case against Shell given seven weeks of other damning evidence. Indeed, the defense pretty much sewed up the prosecutor's case. Hoover and Shell admitted that they were the leaders of what everyone called the "GD" but contended that since 1987 "GD" has stood for "growth and development" rather than "Gangster Disciples." Shell portrayed himself as the CEO of an organization of community activists committed to cleanup, education, political awareness, and suppression of gang and drug activities. Other evidence introduced at trial made mincemeat of that defense (the only gang and drug activities being suppressed were those of the GD's rivals)[.]

---

[11] In contrast, Hoover's second in command—Gregory Shell—received a sentence of 40 years' imprisonment on Count 13. *See* Dkt. 460.

*Hoover*, 246 F.3d at 1059-60; *see also id.* at 1060-61 (noting that co-defendant Adrian Bradd testified in his own defense and ended up "support[ing] the prosecutor's claim that Hoover initiated a program under which members of the Gangster Disciples would 'donate' their profits from drug sales one day each week to supervisory levels of the gang").

By the time of Hoover's direct appeal, the Supreme Court had decided *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," *id.* at 490. The Seventh Circuit held that *Apprendi* did not undermine the validity of Hoover's conviction on Count 2 for engaging in a continuing criminal enterprise ("CCE"): "Because a lawful punishment for *every* CCE conviction is life in prison, we held in [*United States v. Smith*, 223 F.3d 554 (7th Cir. 2000)] that *Apprendi* does not affect sentencing for this offense." 246 F.3d at 1058 (emphasis in original).

Regarding the drug convictions, the Seventh Circuit noted that "[w]hat must be proved beyond a reasonable doubt after *Apprendi* is the minimum quantity needed to authorize a particular punishment." The Seventh Circuit then found that any *Apprendi* violation as to the drug counts was not plain error because of overwhelming evidence at trial that the GDs sold far more than the statutory threshold needed to authorize a sentence of up to life imprisonment: "Evidence in the record establishes beyond any doubt that the Gangster Disciples distributed (much) more than 50

19

grams[12] of crack daily, so given *Pinkerton* (and the jury's verdict convicting each appellant of the over-arching conspiracy) there is no likelihood that any reasonable jury would have failed to find that each is culpable for more than 50 grams of crack." *Id.*

### F. Hoover's § 2255 motion

In 2005, this Court denied Hoover's motion under 28 U.S.C. § 2255, which raised several challenges to the court-authorized interception of conversations between Hoover and his associates at the Vienna prison. *See Hoover v. United States*, No. 03 C 3181, 2005 WL 1498729, at *3 (N.D. Ill. June 7, 2005).

The Seventh Circuit affirmed this Court's denial of co-defendant Gregory Shell's § 2255 motion, which raised similar challenges relating to the Vienna recordings. *See Shell v. United States*, 448 F.3d 951 (7th Cir. 2006). The Seventh Circuit then summarily affirmed the denial of Hoover's § 2255 motion. *See Hoover v. United States*, No. 05-3524 (7th Cir. July 10, 2006).

## II. ARGUMENT

Hoover has now filed a motion under Section 404(b) of the First Step Act ("FSA") seeking a declaration that he qualifies for resentencing on Counts 2-4, 12, 17, and 3. In Hoover's view, those six counts are "covered offenses" whose statutory penalties were lowered by the Fair Sentencing Act's modification of the quantity-based thresholds for certain crack cocaine offenses. Aside from those six counts,

---

[12] Under the Fair Sentencing Act of 2010, 124 Stat. 2372, the threshold quantity of crack cocaine needed to trigger a minimum sentence of 10 years and a maximum sentence of life increased from 50 grams to 280 grams.

Hoover does not even attempt to argue that the sentences imposed on his 34 other counts of conviction were for "covered offenses"—which would be a futile argument given that those sentences were not based on any mandatory minimum penalties for crack cocaine offenses.

The threshold issue in this case is whether Hoover is eligible for a reduction in his mandatory life sentence on Count 2 for engaging in a continuing criminal enterprise. Without a reduction in his life sentence on Count 2, Hoover is embarking on an academic exercise in asking for a reduction in the concurrent, non-mandatory life sentences he received on Counts 3-4 (for employing or using minors in his drug operation) and on Counts 12, 17 and 39 (for possession with intent to distribute or distribution of a controlled substance). Given that landscape, this response focuses on why the First Step Act does not permit—much less require—a reduction in Hoover's sentence on Count 2.

As explained below, Count 2 is not a "covered offense" under the FSA for two reasons: (1) because of the Court's prior finding that Hoover's continuing criminal enterprise received over $10 million in gross receipts, the validity of his mandatory life sentence on Count 2 does not depend on whether his offense also exceeded a statutory, quantity-based threshold relating to crack cocaine; and (2) to the extent drug quantity findings are relevant to upholding Hoover's mandatory life sentence on Count 2, his violation of the continuing criminal enterprise statute—the relevant inquiry for determining whether he was sentenced for a "covered offense"—involved

far more than the revised quantity-based threshold for crack cocaine (8.4 kilograms) needed to trigger a mandatory life sentence.[13]

Second, even if Count 2 is a "covered offense," the Seventh Circuit has repeatedly held that *Alleyne*—which holds that facts triggering a mandatory minimum sentence must be proven to a jury—is not retroactive and nothing about the FSA changes that holding. Third, not even retroactive application of *Alleyne* would require the Court to reduce Hoover's sentence on Count 2 because life imprisonment is a statutorily authorized penalty for *every* continuing criminal enterprise conviction, without the need for any special findings by a judge or jury.

Finally, even if the Court concludes that Hoover was sentenced for one or more "covered offenses" under the FSA, the statute makes clear that the decision whether to reduce Hoover's sentence remains discretionary. Based on the § 3553(a) factors that supported Hoover's life sentence and his ongoing gang affiliation—which is evident from his BOP disciplinary history—the Court should not reduce his sentence on any count of conviction.

### A. Hoover's conviction on Count 2 for engaging in a continuing criminal enterprise is not a "covered offense" under the FSA.

---

[13] The Seventh Circuit recently issued a decision in *United States v. Shaw*, --- F.3d ---, 2020 WL 20292658 (7th Cir. Apr. 28, 2020), holding that that eligibility under § 404 of the First Step Act rests on whether the penalties under the statute of conviction were changed by the Fair Sentencing Act; thus, the eligibility determination under § 404 of the First Step Act focuses on the specific quantity charged in the indictment and either admitted by the defendant or found by a jury. In reaching that conclusion, the Seventh Circuit rejected the government's argument that eligibility under § 404 of the First Step Act turns on the quantity of crack cocaine involved in the offense. The government preserves its statutory coverage argument here in the event of any further review in *Shaw*.

Under Section 404(b) of the FSA, Hoover is not eligible for relief on Count 2 or any other count of conviction unless he can establish that this Court "imposed a sentence for a covered offense." Section 404(a) of the Act defines a "covered offense" as "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372), that was committed before August 3, 2010." As relevant here, Section 2 of the Fair Sentencing Act modified the penalties in 21 U.S.C. § 841(b)(1)(A) and (B) for offenses involving cocaine base or "crack." Specifically, the statutory threshold in § 841(b)(1)(A)(iii) for a sentence of at least 10 years and up to life imprisonment is now 280 grams or more of crack. The statutory threshold in § 841(b)(1)(B)(iii) for a sentence of at least 5 years and up to 40 years' imprisonment is now 28 grams or more of crack.

1. **The validity of Hoover's mandatory life sentence on Count 2 does not depend on whether his offense exceeded a statutory, quantity-based threshold for crack offenses.**

Hoover's conviction on Count 2 is for engaging in a continuing criminal enterprise ("CCE"), which carries a penalty of at least 20 years' and up to life imprisonment without the need for any findings as to drug type or quantity. 21 U.S.C. § 848(a). The Fair Sentencing Act's reforms to the quantity-based thresholds for crack offense did not change anything in the CCE's substantive prohibition:

[A] person is engaged in a continuing criminal enterprise if—

    (1)    he violates any provision of this subchapter or subchapter II the punishment for which is a felony, and

    (2)    such violation is a part of a continuing series of violations of this subchapter or subchapter II—

        (A)    which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

        (B)    from which such person obtains substantial income or resources.

*Id*. at § 848(c). The jury was properly instructed on Count 2 and found that the government had presented proof beyond a reasonable doubt against Hoover on each of the elements cited above. Accordingly—without the need for any additional findings—the Court was statutorily-authorized to sentence Hoover to life imprisonment on Count 2.

In certain circumstances, the CCE statute makes life imprisonment mandatory. The statutory language quoted below shows that drug quantity findings,

24

whether by a judge or jury, are not required to trigger mandatory life imprisonment under the CCE statute as long as an alternative condition relating to the enterprise's gross receipts is satisfied.

> Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a), if—
>
> (1)    such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and
>
> (2)
>
>    (A)    the violation referred to in subsection (c)(1) involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title, or
>
>    (B)    the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in section 841(b)(1)(B) of this title.

21 U.S.C. § 848(b).

In adopting the PSR, the Court found that Hoover satisfied the first condition for a mandatory life sentence on Count 2 because he was the undisputed leader of a gang that had between 10,000 and 30,000 members. PSR ¶¶ 13-14, 20, 40, 90. In addition, the Court found that Hoover satisfied the second condition for a mandatory life sentence on Count 2 for two independently sufficient reasons—drug quantity and gross receipts. Specifically, the Court adopted the corroborated factual findings in paragraphs 15 and 90 of the PSR that the GDs sold approximately 4.5 kilograms of crack per day and grossed over $100 million per year from crack cocaine sales.

The Fair Sentencing Act did not amend the gross receipts condition quoted above. Therefore, the Court's previous finding that the GDs earned over $300,000 per day from drug sales—which was based on Hoover's recorded conversations, "income ledgers," and other evidence, PSR ¶ 15—remains legally sufficient to support his mandatory life sentence on Count 2 without the need for any drug quantity findings. Hoover's motion for resentencing on Count 2 should be denied on that basis.

Hoover's argument that his CCE conviction is a "covered offense" under the FSA ignores the sufficiency of the gross receipts finding and focuses solely on drug quantity—which in this context is simply an alternative basis supporting his mandatory life sentence. Specifically, the CCE statute requires a mandatory life sentence when the violation "involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title." Under the Fair Sentencing Act, the CCE's drug quantity threshold increased from 1.5 kilograms to 8.4 kilograms for crack offenses.

For the reasons explained below, notwithstanding that statutory change, Hoover's conviction on Count 2 is not a "covered offense" under the First Step Act because the Act defines that term with reference to the specific "violation" of the CCE statute that Hoover committed, which involved well over 8.4 kilograms of crack.

2. **The First Step Act conditions eligibility on the specific "violation" of the CCE statute that Hoover committed, which involved far more than the quantity-based threshold needed to trigger life imprisonment.**

Section 404(b) of the First Step Act authorizes a sentence reduction only if the Court previously imposed a sentence for a "covered offense." A "covered offense," in

turn, is defined as a "violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010…that was committed before August 3, 2010." Therefore, the statute conditions eligibility not on statutes that Hoover violated, but on the specific "violation" that he "committed." A "violation" qualifies as a "covered offense" only if the "statutory penalties for" that violation were "modified by sections 2 or 3 of the Fair Sentencing Act."

By referring to a "violation" that was "committed" on a particular date, Section 404(a) sensibly grounds the eligibility inquiry in the actual conduct involved in Hoover's violation, rather than the statute under which he was convicted. This reading is consistent with the Supreme Court's interpretation of the term "violation" in other contexts. In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 489 (1985), for example, the Supreme Court held in the context of 18 U.S.C. § 1964(c) that the term "violation" "refers only to a failure to adhere to legal requirements," not to a criminal conviction. The Court explained that when Congress wishes to refer to "prior convictions, rather than prior criminal activity," it uses the term "conviction," not "violation." *Id.* at 489 n.7. And in *United States v. Hayes*, 555 U.S. 415 (2009), the Court held that a statute defining a prior conviction of a "misdemeanor crime of domestic violence" referred in part to the defendant's actual conduct, not the statutory elements of the crime, when it described the prior offense as one "committed by a current or former spouse, parent, or guardian." *Id.* at 426 (emphasis added) (quoting 18 U.S.C. § 921(a)(33)(A)); *cf. Nijhawan v. Holder*, 557 U.S. 29, 32 (2009)

(holding that a statutory term describing a prior "offense" referred not to a generic crime but to the "particular circumstances in which an offender committed" that offense "on a particular occasion")

In Section 404, Congress easily could have, but did not, declare eligible "any defendant <u>convicted</u> under a statute for which the penalties were altered by the Fair Sentencing Act of 2010, so long as that defendant has not already been sentenced in accordance with that Act." Instead, Congress focused specifically on the "violation" that was "committed." Congress's use of the word "committed" in this provision points especially strongly to the particular facts of Hoover's case because Congress added a date-based qualifier: "that was committed before August 3, 2010."

Moreover, it makes more sense to refer to a "violation" whose "statutory penalties were modified" rather than make FSA eligibility turn on conviction under a "Federal criminal statute, the statutory penalties for which were modified" (which makes the term "statutory" redundant). Thus, the inquiry into what counts as a "covered offense" under the FSA necessarily turns on facts specific to Hoover's offense—when it was committed—and not merely the statutory definitions that appear in 21 U.S.C. § 841(b)(1)(B) and, by extension, the CCE's conditions for a mandatory life sentence.

Because the language of the FSA reflects Congress's intent for courts to assess eligibility based on a case-specific approach, focusing on the actual violation at issue, the Court should not turn a blind eye to the actual quantity of crack involved in Hoover's offense—especially where the Court expressly found that quantity (4.5

28

kilograms of crack per day) as a matter of fact at sentencing following a multi-week jury trial. If, as in Hoover's case, a defendant's "violation" involved a quantity of crack that would have triggered the same CCE penalty before and after enactment of the Fair Sentencing Act, then the defendant's "violation" is not one for which the statutory penalties were modified by the Act, and the court did not impose a sentence for a "covered offense."

### 3. Hoover's construction of the First Step Act would undermine congressional intent by increasing sentencing disparities.

Hoover's claimed eligibility to relief under the FSA not only undermines the statutory text, but also conflicts with Congress's manifest intent, as it would lead to profoundly unfair and illogical disparities between defendants charged before and after the Fair Sentencing Act. There is no dispute that Congress, in enacting Section 404 of the First Step Act, was concerned about a particular class of crack offenders—namely, those whose statutory penalties would have been lower but for the fortuity that they were sentenced before August 3, 2010, and therefore could not take advantage of the Fair Sentencing Act. *See Dorsey v. United States*, 567 U.S. 260 (2012).

For instance, if a crime involved 200 grams of crack, and the defendant was sentenced under § 841(b)(1)(A) (imposing a 10-year mandatory minimum) before August 3, 2010, a court should consider whether to grant a reduced sentence, as the Fair Sentencing Act places the 200-gram offense in § 841(b)(1)(B) (imposing a 5-year

mandatory minimum). This consideration puts the offender in a position identical to those defendants sentenced after August 3, 2010.

If, however, the original crime involved 280 or more grams of crack, the defendant's violation would have triggered the same § 841(b)(1)(A) penalties (10-year mandatory minimum) both before and after the Fair Sentencing Act. If such a defendant had been sentenced after the Fair Sentencing Act, all agree that he could not obtain a discretionary reduction of sentence today. But under Hoover's approach—where any conviction involving crack is a "covered offense"—that same defendant, having committed the same offense conduct, would now be entitled to a discretionary sentence reduction. Nothing in the text or legislative history of the First Step Act suggests that Congress would have countenanced this asymmetry, which is entirely unfair to defendants sentenced after enactment of the Fair Sentencing Act.

A district court in Florida observed that the defense position "would not eliminate disparity but instead would introduce enormous disparity in the opposite direction, giving earlier crack defendants a lower penalty range not available to later crack defendants." *United States v. Blocker*, 2019 WL 2051957, at *5 (N.D. Fla. Apr. 25, 2019).

> [T]he Fair Sentencing Act was intended to lower the sentencing disparity between crack and powder, changing the 100-to-1 drug-amount ratio to approximately 18-to-1. The First Step Act was intended to give that same benefit to earlier crack defendants. The offense-controls theory [determining eligibility based on actual conduct] accomplishes that result. But if sentences for crack offenses are now lowered based on the indictment-controls theory [looking only to the charge in the indictment], an enormous disparity will be created in the opposite direction. Many defendants who committed crack offenses prior to adoption of the Fair Sentencing Act will be subject to lower penalty

ranges than defendants who committed offenses involving the same amount of powder.

Consider, for example, two defendants, one who conspired in 2007 to distribute 5 kilograms of powder, and the other who conspired to distribute 5 kilograms of crack, both with two prior felony drug convictions. In 2007, before adoption of the Fair Sentencing Act, both would have been subject to mandatory life sentences—the powder defendant because the offense involved 5 kilograms or more, and the crack defendant because the offense involved 50 grams or more. The indictments would have tracked the statute, so the powder defendant's indictment would have charged 5 kilograms or more of powder, and the crack defendant's indictment would have charged 50 grams or more of crack. If both were convicted, both would have faced mandatory life sentences.

Under the offense-controls theory, nothing would change. Both defendants would still be subject to mandatory life sentences, just as two defendants who committed the same offenses today would be subject to mandatory life sentences.[ ] There is no reason to believe Congress intended any different result.

But under the indictment-controls theory, the crack defendant would now face a minimum of only 10 years, not life, because he would be treated as having committed an offense involving only 50 grams of crack—not 280 or more as required to trigger the life sentence. This would be the result even though the offense actually involved 5 kilograms of crack and the government could prove it. The powder defendant, in contrast, would continue to serve the mandatory life sentence, because nothing in the Fair Sentencing Act or First Step Act allows a sentence reduction for a defendant whose offense involved only powder. Congress could not have intended to treat crack defendants this much more favorably than powder defendants.

*Id.* at *6. *See also United States v. Elgin Curb*, No. 06 CR 324-31, Dkt. 2454 (Tharp, J.) (holding that the change in the mandatory minimum penalties under the Fair Sentencing Act provided no basis to reduce defendant's sentence pursuant to the FSA, where defendant was held accountable for a quantity of crack in excess of the quantity needed to trigger a ten-year minimum sentence under the Fair Sentencing Act).

As this Court previously found, Hoover's offense involved "4.5 kilograms of crack cocaine being sold on a daily basis," which was corroborated by "taped conversations, videotaped recorded narcotics transactions, testimony at trial, and narcotics and income ledgers and records[.]" PSR ¶ 15, 21; *see also United States v. Smith*, 223 F.3d 554, 568-59 (7th Cir. 2000) (detailing methodology behind drug quantity finding and rejecting argument by GD governors that "Hoover's statements [about the gang's drug sales] were unreliable because they were nothing but idle boasts"). Because Hoover's offense easily involved more than the 8.4 kilograms of crack—in addition to his enterprise collecting over $100 million in gross receipts from drug trafficking—Hoover is subject to a mandatory life sentence under § 848(b) for two independently sufficient reasons both before and after enactment of the Fair Sentencing Act.

If Hoover were to receive a sentence reduction on Count 2 based on the proffered fiction that his offense involved not even 8.4 kilograms of crack—and less than $10 million in gross receipts, a finding that the FSA does not open up for *de novo* review—his sentencing exposure would be lower than that faced by a defendant charged with and convicted of the exact same conduct after August 3, 2010. The purpose of the FSA was to reconcile the disparity between those sentenced before the Act and those sentenced afterwards. It would turn that goal on its head to afford Hoover the windfall of a sentence reduction on Count 2.

**B.     Even if Count 2 is a "covered offense," the First Step Act does not authorize Hoover's requested retroactive application of *Alleyne*.**

In support of his request for a sentence reduction on Count 2, Hoover relies heavily on *Alleyne v. United States*, 570 U.S. 99 (2013), which held that any fact other than a prior conviction that increases a mandatory minimum sentence must be charged in an indictment and found by a jury or admitted by the defendant.

The Seventh Circuit has repeatedly held that "*Alleyne* does not apply retroactively." *United States v. Yates*, 777 F. App'x 829, 830 (7th Cir. 2019) (citing *Crayton v. United States*, 799 F.3d 623, 624 (7th Cir. 2015)). Indeed, in *United States v. Howard*, No. 17-1947, 2017 WL 9485590 (7th Cir. Sept. 28, 2017), the Seventh Circuit affirmed this Court's rejection of the argument made by one of Hoover's co-defendants that under *Alleyne*, "his sentence of life imprisonment under § 848(b) must be reduced because it was based on facts that increased the mandatory minimum sentence, that were not charged, admitted or found by a jury." *Id*. at *2. Hoover even acknowledges that *Howard* is one of many cases standing for the proposition that *Alleyne* is not retroactive. Dkt. 1236 at ¶ 20.

The plain text of the FSA shows that Congress was not intending to issue a statutory directive for courts to apply *Alleyne* retroactively. Section 404(c) of the FSA expressly states, "Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section." Sentence reductions under the FSA would not be discretionary if Congress had intended to require retroactive application of *Alleyne*. *See United States v. Shaw*, --- F.3d ---, 2020 WL 20292658, at *1 (7th Cir. Apr. 28, 2020) (defining relevant inquiries under FSA as whether court "may" reduce

a defendant's sentence and whether the court "should" do so—leaving no room for the theory that a sentence reduction is ever mandatory).

The situation here matches that in *Dillon v. United States*, 560 U.S. 817 (2010), where the Court considered a motion for sentencing reduction under 18 U.S.C. § 3582(c)(2), which allows a court to reduce a sentence, in its discretion, upon adoption of a sentencing guideline amendment designated by the Sentencing Commission as retroactive. The Court rejected the argument that § 3582(c)(2) required retroactive application of *Booker v. United States*, 543 U.S. 220 (2005), which rendered the guidelines advisory.

> Given the limited scope and purpose of § 3582(c)(2), we conclude that proceedings under that section do not implicate the interests identified in *Booker*. Notably, the sentence-modification proceedings authorized by § 3582(c)(2) are not constitutionally compelled. We are aware of no constitutional requirement of retroactivity that entitles defendants sentenced to a term of imprisonment to the benefit of subsequent Guidelines amendments. Rather, § 3582(c)(2) represents a congressional act of lenity intended to give prisoners the benefit of later enacted adjustments to the judgments reflected in the Guidelines.
>
> Viewed that way, proceedings under § 3582(c)(2) do not implicate the Sixth Amendment right to have essential facts found by a jury beyond a reasonable doubt. Taking the original sentence as given, any facts found by a judge at a § 3582(c)(2) proceeding do not serve to increase the prescribed range of punishment; instead, they affect only the judge's exercise of discretion within that range.

560 U.S. at 828.

*Dillon*'s reasoning applies with full force here. Like § 3582(c)(2), the FSA is not constitutionally compelled, but rather is an act of Congressional lenity, which would not, as an ordinary rule in the absence of a Congressional declaration, abrogate prior penalties. *See* 1 U.S.C. § 109. The FSA simply calls for courts to determine whether

34

the statutory penalties would have been different based on the "violation" the defendant "committed," and if so, exercise discretion in determining whether to reduce a sentence. Nothing in the FSA suggests that in conferring discretion on district courts to reduce sentences for certain "covered offenses" Congress somehow authorized retroactive application of *Alleyne* for offenders like Hoover while denying that fortuity to everyone else.

### C. Hoover's life sentence on Count 2 remains within the statutorily-authorized range even without specific findings as to drug quantity or gross proceeds.

Even if the Court holds that the FSA requires retroactive application of *Apprendi* and *Alleyne*, Hoover's sentence on Count 2 remains with the range of legally-authorized penalties even without specific findings on drug quantity or proceeds.

The CCE statute provides: "Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment[.]" 21 U.S.C. § 848(a). Therefore, life imprisonment is a statutorily authorized sentence on Count 2 without regard to whether the Court or the jury made findings under § 848(b) triggering a mandatory life sentence.

On direct appeal, the Seventh Circuit made clear that *Apprendi* did not undermine the validity of Hoover's conviction on Count 2 for engaging in a continuing criminal enterprise ("CCE"). "Because a lawful punishment for *every* CCE conviction is life in prison, we held in [*United States v. Smith*, 223 F.3d 554 (7th Cir. 2000)] that

35

*Apprendi* does not affect sentencing for this offense." *Hoover*, 246 F.3d at 1058 (emphasis in original); *see also Moore v. United States*, 188 F. App'x 494, 497 (7th Cir. 2006) (no *Apprendi* violation for life sentence on CCE conviction because life is statutorily-authorized maximum sentence for every CCE conviction); *United States v. Souffront*, 338 F.3d 809, 827 (7th Cir. 2003) (same)*; United States v. Hill*, 252 F.3d 919, 921 (7th Cir. 2001) (same). In fact, *Smith* was emphatic in "reject[ing]…defendants' argument that the indictment should have charged that they satisfied the criteria of § 848(b) and that the jury should have found those facts beyond a reasonable doubt." 223 F.3d at 566.

Because Hoover's life sentence on Count 2 remains a statutorily authorized penalty even without specific findings as to drug quantity or drug proceeds, no reduction is warranted even if the Court were to conclude that the FSA permits or requires retroactive application of *Apprendi* and *Alleyne. Cf.* Dkt. 1210 at 6 (holding that, absent a jury finding on drug quantity, the Court was "required" to reduce the sentence of co-defendant William Edwards to 20 years on his single count of conviction). As shown in the chart on the next page, all of Hoover's sentences—except his concurrent life sentences on 3-4, 12, 17 and 39—remain within the statutorily-authorized penalty range even if the Court determines that the FSA requires retroactive application of *Apprendi* and *Alleyne*.[14] Of course, given the drug quantities

---

[14] On Counts 3 and 4, the relevant penalty provision, 21 U.S.C. § 861(b), states: "Any person who violates subsection (a) is subject to twice the maximum punishment otherwise authorized…Except to the extent a greater minimum sentence is otherwise provided, a term of imprisonment under this subsection shall not be less than one year." In its response to Shell's FSA motion, Dkt. 1239 at 33, the government incorrectly stated that the statutory

involved in Hoover's criminal conduct, a defendant charged today based on the same conduct would be subject to exact same penalties Hoover faced at the time of his original sentencing.

penalty range on Counts 3 and 4—assuming retroactive application of *Apprendi* and *Alleyne*—would be 0 to 20 years' imprisonment. The correct range is 1 to 40 years.

| Count(s) | Offense | Statutory Range (pre-*Apprendi/Alleyne*)[15] | Statutory Range (post-*Apprendi/Alleyne*) | Sentence Imposed |
|---|---|---|---|---|
| 1 | Drug conspiracy, 21 U.S.C. § 846 | 10 years to life | 0 to 20 years | N/A (dismissed) |
| 2 | Continuing criminal enterprise, 21 U.S.C. § 848(a) | Life | 0 to life | Life |
| 3-4 | Use of a minor in drug operations, 21 U.S.C. § 861(a)(1) | 20 years to life | 1 to 40 years | Life (concurrent) |
| 5, 7-9, 11, 14-16, 18, and 38 | Possession with intent to distribute or distribution of a controlled substance, 21 U.S.C. § 841(a)(1) | 0 to 20 years | 0 to 20 years | 20 years (concurrent) |
| 10, 19-37 | Use of a communication facility, 21 U.S.C. § 843(b) | 0 to 4 years | 0 to 4 years | 4 years (concurrent) |
| 12, 17, 39 | Possession with intent to distribute or distribution of a controlled substance, 21 U.S.C. § 841(a)(1) | 10 years to life | 0 to 20 years | Life (concurrent) |
| 13 | Attempted possession with intent to distribute a controlled substance, 21 U.S.C. § 841(a)(1) | 5 to 40 years | 0 to 20 years | 5 years (concurrent) |
| 40 | Use/carrying of a firearm during/ in relation to drug trafficking, 18 U.S.C. 924(c) | 5 years to life | 5 years to life | 5 years (consecutive) |

---

[15] *See* PSR ¶¶ 90-91.

In summary, even if the Court disagrees with every legal argument the government has made up to this point, Hoover's life sentence on Count 2 remains within the current statutorily-authorized sentencing range, and the only sentences potentially affected by retroactive application of *Apprendi* or *Alleyne* are Hoover's life sentences on Counts 3-4, 12, 17, and 39, which are concurrent and do not affect his total punishment. With the exception of those concurrent life sentences, neither *Apprendi*, *Alleyne*, nor the First Step Act changed Hoover's statutory sentencing exposure; thus, even if the Court finds him eligible for potential relief under the First Step Act, no reduction of his life sentence on Count 2 is warranted.

### D. The Court should exercise its discretion to deny Hoover's motion based on the factors in 18 U.S.C. § 3553(a).

The factual record in this case—including Hoover's offense conduct and his disciplinary record in BOP custody, demonstrating his continuing role as a leader or inspirational figure in the GDs—weighs heavily against a discretionary reduction of his sentence, regardless of how the Court resolves the legal issues discussed above.

#### 1. Hoover's sentence remains appropriate under the § 3553(a) factors.

Hoover's offense conduct and criminal history, viewed in light of the § 3553(a) factors, counsel strongly against any reduction in his sentence.

It is impossible to overstate the seriousness of Hoover's offense conduct. Because of Hoover's iron grip on the GDs—which lasted for decades—many communities in Chicago were ravaged with drugs and gang violence. Hoover destroyed neighborhoods and lives, including minors who were conscripted into his

39

gang. He ordered murders to maintain discipline within the gang and control the territory where his gang sold drugs. He negotiated with the gang's narcotics suppliers and implemented a system to ensure that the profits from drug trafficking flowed up the ranks to his pockets. And Hoover did all this from a state prison where he was already serving a life sentence for murder—which shows that reducing Hoover's federal sentence and sending him back to IDOC custody would pose a threat to public safety.

Hoover's life sentence is both consistent with the § 3553(a) factors and among the most just punishments ever imposed in this district.

### 2. Hoover's disciplinary record while in BOP custody shows that he remains active in directing or influence the gang's operations.

Since starting his term of incarceration, Hoover has shown no signs of rehabilitation. Indeed, Hoover's FSA motion is silent about whether he has engaged in any rehabilitation while in BOP custody—because there is nothing positive to say in that regard.[16]

Far from showing rehabilitation, Hoover's record in BOP custody underscores the continued need for a sentence that protects the public from Hoover, who is still attempting to direct or influence the GDs. According to BOP disciplinary records—attached as Exhibits B-1 to B-8—Hoover has been sanctioned for the following violations, which have escalated in severity over time.

---

[16] *Cf.* Dkt. 1210 at 7 (noting that co-defendant Edwards had "taken advantage of educational and other programs throughout his time in custody" and submitted a letter of support from his sister); Dkt. 1225 at 7 (noting similar rehabilitation evidence submitted by co-defendant Jackson).

- In May 1996, at the MCC in Chicago, Hoover was caught maintaining commissary items in a second, unauthorized locker and refused to move those items to a proper storage area. *See* Exhibit B-1.

- In July 1996, at the MCC in Chicago, Hoover engaged in an unauthorized three-way telephone conversation. *See* Exhibit B-2.

- In October 1997, at USP Terre Haute, Hoover engaged in disruptive conduct by threatening to have his group of inmates from Chicago start fires or destroy property unless prison staff allowed them to congregate in a large recreational area. Hoover made that threatening statement within earshot of his fellow GDs, including his second-in-command Gregory Shell. Hoover denied that he was trying to encourage a demonstration. *See* Exhibit B-3.

- In September 1999, at ADX Florence, Hoover aided and abetted the assault of another inmate that lasted approximately eight minutes. As captured on video, Hoover restrained the victim while another inmate struck the victim in the face and torso with a closed fist. During the incident, the assailant reached towards a drain in the recreation yard where prison staff later recovered a homemade knife. *See* Exhibit B-4.

- In June 2015, at ADX Florence, Hoover engaged in unauthorized communication with another inmate via coded messaging. Both Hoover and the other inmate—who addressed Hoover as "Chief"—had copies of the same dictionary needed to decipher the coded message. The message read:

> Chief, this code is very important. We both have to be absolute about this interpret [sic] system. Whenever we see a word with a small dash

in front, we do not count that word. We only count the whole word that is the farthest over to the left. We also count every single letter. Only we know this code. Nobody else does. We communicate in plain sight. I am ready to handle your business.

*See* Exhibit B-5.

• In September 2015, at ADX Florence, Hoover communicated his gang affiliation during an inmate visit. Specifically, Hoover and his visitors discussed several known GDs—including Johnny "Crusher" Jackson, who was released by this Court last year. Hoover also discussed a recent meeting between the GDs and the Black P Stones, suggested ways to hold members of the GDs accountable, and directed one of his visitors to send him information about a GD suspected of cooperating with law enforcement. The prison investigator who monitored Hoover's visit concluded, "Hoover is attempting to run, control, and guide the actions of the GD organization from inside the ADX…[His visitors] are attempting to check on several GD related topics as well as seeking explicit direction from inmate Hoover." *See* Exhibit B-6.

• In August 2017, at ADX Florence, Hoover communicated his gang affiliation during an inmate visit. Hoover and his visitor also discussed several known gang members and their involvement in various businesses. Hoover also discussed the need to have the "Blueprint" republished so it could be handed out and read by children. According to the incident report, the "Blueprint" was originally published in October 1995 as part of a failed attempt to legitimize the Gangster Disciples as a "Growth and Development" organization. *See* Exhibit B-7.

When prison investigators asked Hoover about the "Blueprint," he said it was used as a defense in his legal case. As the Seventh Circuit observed on direct appeal, the trial evidence "made mincemeat of that defense." *Hoover*, 246 F.3d at 1059-60.

- In July 2018, at ADX Florence, Hoover engaged in unauthorized communication with another inmate, who was so eager to speak with Hoover—because of Hoover's stature and continuing influence—that he laid on the ground during the conversation. *See* Exhibit B-8.

In summary, Hoover's infractions have escalated from simple rule violations (showing a lack of respect for the law) to his discussion and direction of gang activities (showing that Hoover poses an ongoing threat to public safety and needs to remain in a maximum security prison). The need for a sentence that promotes specific deterrence and protects the public from Hoover remains as strong today as it was at the time of Hoover's sentencing.

### 3. Reducing Hoover's sentence would do severe damage to the goals of general deterrence and promoting respect for the law.

In § 3553(a)(2), Congress directed courts to consider the need for general deterrence and promoting respect for the law when sentencing a defendant. Those goals carry added importance in the case of a defendant like Hoover—who is the most notorious gang leader in Chicago's modern history. Simply put, reducing Hoover's sentence to anything less than life imprisonment would send shockwaves through the community. Gang members will be emboldened and the rest of the community will worry that Hoover's return to IDOC custody—where he remains subject to a life

sentence for murder—puts him back in a position from which he directed the gang's operations for decades. Given Hoover's role at the apex of the GDs and his continuing involvement in the gang's activities, it is critical for both general deterrence and public safety that his sentence remain unchanged.

## III. CONCLUSION

WHEREFORE, the government respectfully requests that the Court deny Larry Hoover's motion for relief under the First Step Act. As stated in a separately filed motion (Dkt. 1245), the government also seeks to be heard at oral argument on the motions filed by Hoover and co-defendant Gregory Shell, unless the Court elects to deny those motions based on the briefs.

Dated: May 1, 2020        Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    */s/ Grayson Sang Walker*
GRAYSON SANG WALKER
Assistant United States Attorney
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 697-4091

**CERTIFICATE OF SERVICE**

I, Grayson Sang Walker, hereby certify that on May 1, 2020, I electronically filed the foregoing **GOVERNMENT'S RESPOSE TO DEFENDANT LARRY HOOVER'S MOTION FOR RELIEF UNDER THE FIRST STEP ACT** with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the Case Management/Electronic Case Files (CM/ECF) system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


By:     */s/ Grayson Sang Walker*
        GRAYSON SANG WALKER
        Assistant United States Attorney
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 697-4091