## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA,     )
          )
       Plaintiff,     )
          )
     -v-     )     No. 95 CR 508-1
          )     Hon. Harry D. Leinenweber
LARRY HOOVER,     )
          )
       Defendant.     )

### DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
### MOTION FOR RELIEF UNDER THE FIRST STEP ACT

### I.  DEFENDANT'S OFFENSES WERE "COVERED OFFENSES"
### FOR PURPOSES OF THE FAIR SENTENCING ACT

#### A.  The Fair Sentencing Act's Modification of the Statutory Penalties
#### Modified the Continuing Criminal Enterprise Statute and Therefore
#### The Defendant's CCE Conviction was a "Covered Offense

Twenty pages into its response the Government finally addresses what it concedes as the

threshold issue this case, which is whether Larry Hoover ("Hoover") is eligible for a reduction of

sentence based on the Fair Sentencing Act ("FSA"). The only possible impediment is whether

the conviction Hoover suffered on Count Two is not a "covered offense" under the Act. As the

Government eventually appears to concede – on page 22 – the Seventh Circuit recently decided

this issue in *United States v. Shaw,* 2020 U.S.App. LEXIS 13549, when it held, consistent with

the arguments Hoover made in his original motion, that the statutory penalties modified by

sections 2 or 3 modify the phrase "federal criminal statute" and do not refer to the quantities of

crack cocaine involved in the specific offense. The court cited a litany of cases agreeing with

that conclusion. *United States v. Shaw,* 2020 U.S.App. LEXIS, at *8.[1] *See also United States v. Benford,* 2020 U.S.Dist. LEXIS 80492 (N.D.. Il.) (Judge Kennelly).[2]  It affirmed the conclusion this Court reached almost a year ago in *United States v. Johnson,* 2019 U.S.Dist. LEXIS 104935 (N.D.Il.), at *7 (it is the statute of conviction, not actual conduct, that controls eligibility under the First Step Act), and reiterated when granting the defendant's First Step Act motion for a codefendant in this very case. *United States v. Edwards,* 2019 U.S.Dist. LEXIS 146571 (N.D.Il.)

In other words, section 404(b) calls for an examination whether the penalties for the criminal statute that was violated were modified by the Fair Sentencing Act, not the specific facts of the particular case. *United States v. Ervin,* 2020 U.S.Dist. LEXIS 69661 (N.D.Il. (Judge Kennelly); *United States v. Cole,* 2019 U.S.Dist. LEXIS 125672 (N.D.Il.) (Judge Chang); *United States v. Jones,* 2019 U.S.Dist. LEXIS 174310 (N.D.Il.) (Judge Ellis). *See also United States v. Williams,* 402 F.Supp.3d 442 (N.D.Il. 2019) (Judge Chang) (citing Northern District of Illinois cases).  In the instant case penalties under 18 U.S.C. § 848 were unquestionably modified by the Fair Sentencing Act when the Act modified the penalties under section 841.  "The most natural reading of the First Step Act's definition of "covered offense" is that "the statutory penalties for which were modified by [certain sections of the Fair Sentencing Act] refers to "a Federal criminal statute" rather than "a *violation* of a Federal criminal statute."" *United States v. Wirsing*, 943 F.3d 175, 185 (4th Cir. 2019) (some quotation marks omitted).  Section 848 was therefore a

---

[1] *United States v. Smith*, 954 F.3d 446 (1st Cir. 2020); *United States v. Jackson*, 945 F.3d 315, 320 (5th Cir. 2019); *United States v. McDonald*, 944 F.3d 769, 772 (8th Cir. 2019); *United States v. Beamus*, 943 F.3d 789, 791-92 (6th Cir. 2019); *United States v. Wirsing*, 943 F.3d 175, 185-86 (4th Cir. 2019).

[2] Not specifically mentioned by the Seventh Circuit was the Fourth Circuit's order in *United States v. Maupin,* 2019 U.S.App. LEXIS 27180.  In *Maupin* the court held that defendant's RICO conviction was a covered offense because it was based on his conviction for the distribution crack cocaine, a statute amended by the Fair Sentencing Act.  As Hoover argued in his original motion, his Continuing Criminal Enterprise conviction was based on the statutory penalties that were amended by the Fair Sentencing Act as well.

"statute of conviction" modified by the Fair Sentencing Act. *United States v. Dean,* 2020 U.S.Dist. LEXIS 86324 (D.Minn.) (no question that conduct underlying defendant's conviction involved distribution of crack cocaine that triggered the mandatory life sentence in section 848; defendant convicted under section 848 was therefore eligible for relief under First Step Act); *United States v. Jimenez,* 2020 U.S.Dist. LEXIS 76721 (S.D.N.Y.), at *8 n.1 (Defendant convicted under section 848 eligible for First Step Act relief). *See also United States v. Parks,* No. 95-510-1, DKT 2047 (April 7, 2020) (Judge Bucklo) (reducing defendant's CCE mandatory life sentence pursuant to First Step Act); *United States v. Walker,* No. 95-101 (N.D.N.Y.) (Oct. 25, 2019) DKT 620 (reducing defendant's CCE mandatory life sentence pursuant to First Step Act); *Hall v. United States,* No. 93-162 (E.D.Va.) (Feb. 19, 2020) (reducing defendant's CCE mandatory life sentence pursuant to First Step Act).

There is no doubt that the Fair Sentencing Act modified 18 U.S.C. § 841 when it modified the quantities of crack cocaine the Government had to prove in order to impose against Larry Hoover the particular sentences under the statute's sentencing provisions, which in turn modified the what was needed to impose the mandatory life sentence mandatory minimum in the CCE statute, 21 U.S.C. § 848. Count II of the Superseding Indictment states specifically that Hoover violated the CCE statute based on violations of 21 U.S.C. 841; it refers to that statute directly. It could not be any clearer that Hoover's sentence was based upon the penalty provisions of section 841 when it identified that statute in the body of the CCE charge.

Consequently, as the Defendant's mandatory life sentence imposed under Count Two constitutes a "covered offense," Hoover is eligible for First Step Act relief. The Fair Sentencing Act modified statutory penalties in 18 U.S.C. 841 and in turn in section 848. That is all the First

Step Act requires. The rest is up to the discretion of the Court. Hoover therefore asks the Court
to set the matter down for a hearing as to the appropriate sentence.

###    B.  Even If the Court Felt It Necessary to Isolate the "Gross Receipts" Condition, The Defendant's Would Still Fall Under Eligible For Relief <u>Under the Fair Sentencing Act</u>

The Government attacks Hoover's argument for focusing on drug quantities and ignoring
the gross receipts, an alternative basis for the CCE enhanced statutory mandatory minimum
sentence of which Mr. Hoover complains. But the gross receipts condition is part of the same
statute the Fair Sentencing Act modified. It is the statute itself that makes something a "covered
offense." Whether the "gross receipts" condition was directly in the crosshairs of section
841(b)(1)(B) does not alter the fact that the Fair Sentencing Act modified that statute and section
848 as an intended consequence.

Assuming any reason exists for a deeper dive into the gross receipts issue beyond the fact
that the Fair Sentencing Act modified the penalties available under the CCE statute – and
Defendant does not believe there is -- the result is the same. The Superseding Indictment
charged Hoover only with violating 18 U.S.C. § 848(a), the jury instructions asked the jury only
to decide whether Defendant trafficked in the lesser quantity charged in the indictment or
obtained "substantial income or resources" therefrom  -- violations of section 848(a) -- and then
the Court determined whether the quantity of drugs and/or gross receipts threshold met enhanced
statutory minimums under section 848(b). (Ex. A, Superseding Indictment; Ex. B, CCE Jury
Instructions). The jury did not decide whether Hoover's trafficking in crack cocaine reached
either the quantity in numbers *or* the gross receipts in dollars that would have subjected Hoover
to enhanced mandatory minimum sentencing penalties.

In other words, even if one were to isolate the "gross receipts" prong, as the Government does, the Government would still have to prove to the jury that Defendant was a principal leader of an organization that received $10 million in gross receipts during any 12-month period of existence attributable to the distribution of a controlled substance described in section 841(b)(1)(B). 21 U.S.C. § 848(b)(2)(B). "[S]ection 848(b) requires the jury to find, beyond a reasonable doubt, elements in addition to those stated in section 848(a), [and therefore] section 848(b) resulted in a new offense rather than a sentence enhancement." *United States v. Loera,* 2018 U.S.Dist. LEXIS 153091 (E.D.N.Y.), at *6-7, *quoting Torres,* 901 F.2d 205, at 240-41 (2d Cir. 1990), and *also citing United States v. Givens,* 2008 U.S.App. LEXIS 15280 (2d Cir.), at *3. And even if it does not state a substantive offense in the abstract, a fact that increases a statutory mandatory minimum sentence must be proven to the jury beyond a reasonable doubt. *Loera,* 2018 U.S.Dist. LEXIS , at *7, citing *Alleyne v. United States,* 570 U.S. 99, 115 (2013).

A defendant violates the CCE statute where, while occupying a leadership position in concert with five or more persons, he commits a continuing series of qualifying felonies from which he obtains substantial income or resources. 21 U.S.C. § 848(a). If convicted he may be sentenced anywhere from 20 years to life. *Id.,* § 848(a). If the gross receipts from the CCE violation exceeds $10 million dollars in any twelve-month period, he *shall* be imprisoned for life. *Id.,* § 848(b)(2)(B). The jury found Hoover guilty under section 848(a); it made no finding under section 848(b)(2)(B). The finding in support of mandatory life imprisonment was made solely by the Court and Probation Office. And whether the Government presented an alternative basis for the mandatory sentence of life imprisonment, the enhanced mandatory minimum was necessarily co-dependent with the quantity of drugs, a quantity not found by the jury.

In the end, the bottom line does not change.  The Fair Sentencing Act increased the quantity of controlled substances mandating a life sentence, making a violation of the CCE statute a "covered offense" for purposes of the First Step Act. *See also United States v. White,* 415 F.Supp.3d 15, 38 (D.D.C. 2019) ("[S]ince the statutory penalties for each of the statutes underlying the defendants' convictions on Counts 1, 5, 11, and 18 were modified by FSA's section 2, the defendants were sentenced for "covered offense[s]" under Section 404(a) and are eligible for review of their sentences, under Section 404(b), to determine whether and to what extent a sentence reduction is warranted.").  Hoover qualifies for resentencing.

### C.  A New Sentencing Requires Applying Sentencing Laws As They Exist on the Date of the New Sentencing

Hoover argues in his motion that he is entitled to a new sentencing, one where the Government can no longer rely on prior law that permitted the Court to find facts that increased a defendant's sentencing exposure based on preponderance of the evidence or something else less than proof beyond a reasonable doubt.  The Government writes that Hoover conceded that *Alleyne v. United States,* 133 S.Ct. 2151 (2013), was not retroactive and therefore did not apply to his case.  No, Hoover pointed out that unlike a typical habeas petition the First Step Act permits a fresh resentencing with all the ingredients the present laws require. ECF 1232, at 3329. *See also Wright v. United States,* 425 F.Supp.3d 588, 595-96 (D.C.Va. 2019) (after finding First Step applicable, court may impose a new sentence based on the law in effect at the time or of resentencing).

When Hoover was sentenced, matters such as drug quantities were not considered elements of the offense but sentencing factors the Judge could consider by a preponderance of the evidence. *Jones v. United States,* 2020 U.S.Dist. LEXIS 7110 (E.D.Va.), at *15.  Under current law, owing to *Alleyne,* factors that increase mandatory minimum sentences must be

decided by a jury under the standard of proof beyond a reasonable doubt. While section 404(b) of First Step Act does not *require* the court to re-sentence a qualifying defendant to a reduced sentence, it allows the court to do so, using all the principles enunciated in *Alleyne, Apprendi,* and *Booker*. The *Jones* court, in rejecting the Government's argument otherwise, observed that the practical consequences of the Government's interpretation

> would be to render *any* defendant convicted of an unspecified quantity of crack cocaine ineligible for consideration under the First Step Act based on documents unreviewed by the jury. As a practical matter, the Government is asking for the perpetration of the injustices of the pre-FSA crack cocaine penalty structure that have since been rejected by Congress by assuming that Congress would not want the principles of *Alleyne* and *Apprendi*, as well as *Booker*, to apply to the Court's present consideration of Petitioner's eligibility under the newly enacted First Step Act. Further, the Government's statutory interpretation would require the Court to "speculate" about what the Government may have been able to prove to a jury beyond a reasonable doubt – which is even more dubious than asking the Court to "speculate" about what the Government would have charged under current law.

*Jones,* 2020 U.S.Dist. LEXIS, at *17.

The Seventh Circuit reached an opposite conclusion in *United States v. Smith*, 223 F.3d 554, 565 (7th Cir. 2000), but reached that decision based entirely on the then recently decided *Apprendi*, which addressed only whether a factor that increases the penalty for a crime beyond the prescribed statutory *maximum* had to be submitted to the jury and proved beyond a reasonable doubt. The *Apprendi* Court did not directly address whether statutory *minimum* requirements did not need to be proved beyond a reasonable doubt by the jury. But *Smith* was decided prior to *Alleyne*, which of course held that mandatory minimums suffered the same malady as statutory maxima, and also needed to be decided by the jury beyond a reasonable doubt. *Alleyne v. United States,* 570 U.S. 99, 115 (2103) (other than a prior conviction, the Sixth Amendment requires "that any fact … that increases the statutory maximum *or mandatory minimum* penalty for an offense be proven to the jury beyond a reasonable doubt." *See also*

*United States v. Rosemond*, 595 Fed.Appx. 26, 30 (2d Cir. 2014) (Rosemond notes that the question of whether he was a "principal administrator, organizer, or leader" was not submitted to the jury, and correctly argues that imposing a heightened mandatory minimum sentence based on facts not found by the jury runs afoul of Alleyne v. United States, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), which was decided after his trial).

This Court followed that reasoning in *Edwards*.  It noted with respect to Hoover's codefendant, William Edwards, the jury did not find beyond a reasonable doubt that Edwards was accountable for 1.5 kilograms of crack cocaine.  "Because no such amount was specified in the jury verdict, the Court cannot hold Edwards to a higher statutory penalty." *Edwards,* 2019 U.S.Dist. LEXIS at *8.  Under the law today, the law upon which *Edwards* would be resentenced, the maximum sentence was the amount charged in the Indictment, consistent with *Apprendi*, *Alleyne*, and *Booker*. *See also United States v. Burke,* 2019 U.S.Dist. LEXIS 110143 (E.D.Tenn.), *and cases cited therein*; *United States v. White,* 2019 U.S.Dist. LEXIS 119164 (S.D.Tx.), *and cases cited therein*.  The same principles apply to Hoover.

To the extent the sentence was based on the gross receipts, the same analysis applies. The Government did not charge Hoover with a specific amount of gross receipts and it did not ask the jury to find that a certain amount of gross receipts was involved.  At most, the jury found, in line with the jury instruction, "substantial" income as a result of his crimes.  A "substantial" amount of income permits, but does not mandate, a life sentence.  The idea that a defendant could be sentenced to a mandatory (minimum) life sentence based on a post-verdict court finding where the jury verdict subjected him to a mandatory minimum of only 20 years offends due process and insults the very notion of trial by jury and the companion protection of proof beyond a reasonable doubt.

So not surprisingly the great weight of authority holds that a judge's sentencing findings, usually made only by a preponderance of the evidence, cannot be used to establish the statutory range for the purposes of the First Step Act. *See United States v. Moore,* 412 F.Supp.3d 1111, 1117-18 (D.Neb. 2019) (citing cases). In the instant case neither the amount of drugs sold nor the gross receipts were anything more than speculation, depending mostly upon statements Hoover made that reflected the amount of money he allegedly thought or wished he could have made through his "one day a week" plan. We now know the Government needed to populate that speculation with proof beyond a reasonable doubt.

When it comes to re-sentencing, the court in *Moore* posed the question as follows:

> Statutory minimum and maximum sentences present more of a challenge. If a defendant, for instance, faces a mandatory minimum sentence of 5 years, and is sentenced to 6 years imprisonment, does that mean that the statutory minimum was irrelevant to the sentencing court? Or, perhaps the minimum and maximum terms set "floors" and "ceilings" for certain kinds of offense conduct, perhaps providing a reference point for a sentencing judge who is concerned (as is required) with "the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." *See* § 3553(a)(6); *cf. Alleyne v. United States,* 570 U.S. 99, 115-16, 133 S.Ct. 2151, 186 SL.Ed.2d 314 (2013). If so, then a change in the range of allowable sentences for a particular defendant must, to be given retroactive effect, at least permit the sentencing court to consider whether the defendant might have been sentenced differently had he statutory range been different.

*United States v. Moore,* 412 F.Supp.3d at 1116.

Apropos the instant case, based on the jury's findings beyond a reasonable doubt, Hoover faced a possible sentence between 20 years and life. Based on findings by the United States Probation Office and adopted by the court, the sentence morphed into mandatory life. Understanding the actual sentencing possibilities, the court could and might have sentenced Hoover to less than life imprisonment not only on the CCE count, but to lesser sentences on other counts that may have been influenced by the mandatory life sentence the court was going to impose for the CCE offense.

The jury made no findings with respect to either the quantity of drugs or the amount of the gross receipts.  The Probation Office and the Government extrapolated and estimated the amounts of both -- post-verdict -- based on taped conversations.  They did, in other words, what the jury was required to do if Hoover was going to be eligible for an enhanced statutory minimum.  In doing so Hoover was sentenced based on a higher mandatory minimum than the quantities and amounts alleged in the Indictment or found by the jury beyond a reasonable doubt.

## II.  DEFENDANT'S SENTENCES SHOULD BE REDUCED AFTER A HEARING ON THE ELEMENTS OF SECTION 3553(a)

### A.  Introduction

Defendant focused his motion principally on the issue of whether Hoover's offenses qualified as "covered offenses" for purposes of the First Step Act, requesting a hearing once the court agreed. Along with its response in opposition to Hoover's motion on the law, the Government argues alternatively that even if Hoover does qualify the Court should not grant him relief.  The Government argues that Hoover's disciplinary history while in BOP custody shows no signs of rehabilitation.  The Government construes as a concession that Hoover's First Step Act motion was "silent" as to whether he engaged in any rehabilitation while in BOP custody.  In fact, Hoover made clear in his First Step Act motion that he was asking the Court to find that his offenses were "covered offenses" under the Fair Sentencing Act, and then holding a hearing or taking additional evidence or argument for the Court to decide whether to exercise its discretion to reduce his sentence.  But as Government raises the issue now, Defendant will respond.

The Government begins by listing eight infractions – mostly low 300 level -- for which Hoover has been sanctioned over the years. (Gov. Resp., Ex. B).  Immediately apparent is that the Government is talking about an average of one matter every three (3) years.  The first four

allegedly occurred more than 20 years ago. Contrary to the Government's representation that Hoover has shown no signs of rehabilitation, he has completed over 100 hours of educational courses while in federal prison covering subjects including communication, history, science, health and wellness, music and philosophy. (Ex. C, Educational Transcript). Given that he has been housed in severe isolation during this time, self-study and taking advantage of educational courses offered by the ADX Supermax is the only way he could demonstrate rehabilitation, and Hoover has done so. He has always maintained a full course load of educational programming. It is important to note that these courses are voluntary, and many inmates prefer not to participate.

At the beginning of his incarceration in federal prison over two decades ago Hoover experienced a period of institutional adjustment due to having a tough time reconciling the fact he was about to spend the rest of his life in prison. Since being transferred to ADX Florence Supermax Prison in Colorado, Hoover has maintained good conduct and only accumulated the handful of infractions. The Government exaggerates his disciplinary history to paint a portrait of Hoover as still running a formerly notorious but now defunct drug enterprise from the most secure prison in the world, where his every telephone call and visit is monitored in real time. In fact, Hoover devoted himself to self-improvement and took part in every program offered him. He became a voracious reader. With this regiment of self-improvement and rehabilitation in the face of spending the rest of his life in solitary conferment, Hoover went for 16 years without an infraction.

Typically, inmates sent to ADX Florence are placed in one of six units based on their criminal history. (Ex. D, ADX 2018 Inspection Report Excerpt). Privileges and procedures vary depending upon which unit the inmate is placed. The inmate population is housed in ADX at

nine different maximum-security units divided into six security levels: 1) the Control Unit; 2) the Special Housing Unit ("SHU"); 3) Range 13, an extremely secure and isolated four-cell wing of the SHU; 4) the Special Security Unit ("SSU"); 5) General Population Units (Delta, Echo, Fox and Golf Units); and 6) the Intermediate Unit/Transition Units (Joker and Kilo Units), which house prisoners entered into a "Step-Down Program," a program prepares inmates to transition out of ADX altogether.

Depending on the unit, prisoners spend at least 20 and as many as 24 hours per day locked alone in their cells. The cells measure seven by 12 feet and have solid walls that prevent prisoners from viewing the interiors of adjacent cells or having direct contact with prisoners inside them. The prison furnishes each cell with a concrete bed, desk and stool, and a stainless combination sink and toilet. The beds have thin mattresses and blankets laid over concrete. Each cell contains a single window, approximately 42 inches high and four inches wide, allowing a modicum of natural light, but through which prisoners cannot see anything outside their cells other than the building and the sky.

With few exceptions, ADX allows prisoners out of their cells only for limited social or legal visits, the former being closely monitored by ADX staff, for some forms of medical treatment, and for a few hours a week for solitary indoor or outdoor recreation while sealed in above ground cages. Hoover has spent the last 18 years in the General Population Units which included the aforementioned period of 16 years of clear conduct. During the past four years since entering the Kilo unit there have been four instances where Hoover received minor disciplinary infractions, all non-violent and non-criminal.

The Government weaves a false narrative that Hoover's infractions have "escalated" over time. The single most serious violation occurred 21 years ago, in 1999. Since that time the

prison itself has gone out of its way to characterize any communication Hoover has had with the outside world as "gang related," and the Government response here uses that characterization to suggest his release would be a threat to public safety as if he is still allegedly attempting to direct or influence the Gangster Disciples while in isolation in most secure prison in the world. The prison has gone so far as to restrict as gang related correspondence sent by one of Hoover's undersigned attorneys.[3] (Ex. E, Returned Correspondence; Ex. F, Returned Correspondence). The Government's concentration on the Gangster Disciples of nearly 30 years ago is not probative to any honest analysis of Mr. Hoover's eligibility for relief. The Government's profile of the Gangster Disciples is antiquated. To cast them as any kind of functional organization that exists today would be fiction and extremely prejudicial to any honest evaluation of Mr. Hoover's ability for relief.

The fact is that the person Hoover was before he went to prison forty years ago is not the same as the 70-year old man he is today. He suffers from Type II diabetes and a two-year bout with stomach issues for which an angioscopy was recommended by a prior prison physician but has since been denied. The amount of time he has served, his disciplinary record, his age and medical condition, make him an appropriate candidate for First Step Act relief.[4]

---

[3] Mr. Hoover, filed an injunction September 2019 to deter ADX Florence from violating his right to privileged communications with Mr. Moore and he is currently in the process of exhausting administrative procedures for the second violation so he can seek legal redress. (Ex. G, Complaint for Injunctive Relief).

[4] Hoover cannot hide from the criminal conduct that brings him to where he is today, but the Government does cite some facts that invite some response. For instance, the Government writes that Francis Parker High School expelled Hoover for shooting a gang member; in fact, Hoover was the one who received the bullet. And the Government notes that in 1973 Hoover was convicted for murder along with Andrew Howard. Howard the triggerman was paroled out of State custody in 1994 for the crime.

The Government uses Hoover's eight infractions (over 24 years) to argue against the Court exercising its discretion to grant him First Step Act relief. Hoover addresses each infraction in turn, including those that occurred prior to his transfer to ADX Florence.

### B. The Government Exaggerates Hoover's Disciplinary History

The BOP ranks infractions by category. (Ex. H, ADX Admission and Orientation Manual, Attachment D, pages 1-14):

Codes 100-199, Greatest Category: Offenses involving explicit criminal conduct;

Codes 200-299, High Category: Offenses involving low level criminal offenses and unauthorized behavior;

Codes 300-399, Moderate Category: Offenses of explicitly unauthorized behavior; and,

Codes 400-499, Low Moderate Category: Explicitly unauthorized behavior violations.

With that in mind, Hoover's disciplinary record is as follows:

1) In May 1996, at the Chicago MCC, Hoover received a Level 318 (Moderate) infraction for using unauthorized equipment/machinery, *i.e.*, using a second locker without permission. He lost 30 days of commissary privileges as punishment. (Ex. I, Chronological Disciplinary Record; Gov. Ex. B-1).

2) In July 1996, at the Chicago MCC, Hoover received a Level 406 (Low Moderate) infraction for using the mail or telephone without authority when he had a brief conversation with a third party patched into a telephone call. He received seven days loss of commissary privileges. (Ex. I, Chronological Disciplinary Record; Gov. Ex. B-2).

3) In October 1997, at USP Terra Haute, Hoover received a Level 299 (Low High, most like 203) infraction for disruptive conduct based on a statement he allegedly made that the reporting officer considered threatening. Hoover received seven days of disciplinary

14

segregation, and loss of telephone privileges for 180 days, with 150 days suspended pending clear conduct. (Ex. I, Chronological Disciplinary Record; Gov. Ex. B-3).

4) In September 1999, at ADX Florence, Hoover received his most serious violation, a Level 101 (Greatest) infraction, based on a physical altercation with other inmates. ADX disallowed good conduct time, taking away 41 days. He was placed in disciplinary segregation for 60 days and lost commissary privileges for 120 days and television privileges for 90 days. (Ex. I, Chronological Disciplinary Record; Gov. Ex. B-4).

5) Hoover remained infraction free for the next 16 years. Then, in June 2015, while at Florence ADX, Hoover received a High category infraction when another inmate attempted to have an unauthorized communication with him. (Ex. I, Chronological Disciplinary Record; Gov. Ex. B-5). A review of the Government's response and its Exhibit B-5 reveals Hoover did not personally engage in communication with this inmate, nor did he receive communication from this inmate. All that was determined was that an inmate, who was also in solitary confinement, wished to find a way to communicate with another person, and intended to use a dictionary, which most if not all inmates have access to. The Government implies the attempted communication was gang related. ADX Florence, however, after originally applying a 335 "communicating gang affiliation" sanction, expunged that charge because it lacked evidence the intended communication concerned gang activity.

Ultimately, Hoover was given a Code 296-level infraction, "Use of the Mail for Abuses Other than Criminal Activity, Circumventing the Mail," for being the intended recipient of an unauthorized communication. The sanction of 15 days disciplinary segregation was imposed but suspended pending 180 days of clear conduct, due to ADX Florence believing disciplinary segregation was not necessary and the suspended sanction, functioning as a warning, was

15

sufficient deterrence of future misconduct. He lost commissary privileges and suffered a $75 monetary fine. (Ex. I, Chronological Disciplinary Record; Gov. Ex. B-5). He did not forfeit good time or non-vested good conduct time credit, he was not disallowed from receiving good conduct time, he was not assessed a disciplinary transfer or disciplinary segregation, and statutory good time was not withheld.

6) In September 2015, at ADX Florence, Hoover received a Moderate level infraction for a three-day inmate visit. (Ex. I, Chronological Disciplinary Record; Gov. Ex. B-6). The Government submits he was recorded discussing some former gang associates of the Gangster Disciples who apparently met another gang's members in a meeting that occurred on the street. ADX Florence monitors his every conversation Hoover and no member of ADX Florence's staff interrupted this discussion and denied further visitation as policy indicates. It appears the prison construed the mere mention such alleged former associates, regardless of content, as a gang communication. It was all recorded, and that may be its right in turns of prison discipline. But even if so, there is no indication the conversation was in furtherance of any criminal activity. Ironically the author of the report notes that Hoover made statements indicating efforts to end gang violence, not promote it. This last point is buttressed by the fact that two months after this visit, U.S. Congressman Bobby Rush visited Hoover to discuss identical issues regarding strategies to end gang violence in Chicago.

Hoover received a Moderate 335 level infraction. He was sanctioned with 30 days of commissary restriction. He did not forfeit good time or non-vested good conduct time credit, ADX did not disallow him receiving good conduct time, he was not assessed a disciplinary transfer or disciplinary segregation, and statutory good time was not withheld. (Ex. I, Chronological Disciplinary Record; Gov. Ex. B-6).

7) In August 2017, at ADX Florence, Hoover received a Moderate level infraction for allegedly communicating gang affiliation. (Ex. I, Chronological Disciplinary Record; Gov. Ex. B-7). ADX Florence initially included a Code level 197, "Greatest Category" offense violation ("Use of the Telephone to Further Criminal Activity"), based on a social visit (that was of course being monitored). The discussion included the re-publishing Hoover's 1995 book The Blue Print about transitioning the "Gangster Disciples" into a socially legitimate "Growth & Development." The prison subsequently determined the conversation did not involve a communication of criminal activity and re-designated the violation as a Code 335 "Moderate" offense. Hoover received 15 days of lost commissary to defer future violations.

8) Finally, in July 2018, at ADX Florence, Hoover received two Moderate Level infractions. (Ex. I, Chronological Disciplinary Record; Gov. Ex. B-8). The conduct described in the report departs from what the Government describes in its response. The Government states that another "inmate, who was so eager to speak with Hoover -- because of Hoover's stature and continuing influence—that he laid on the ground during the conversation." The incident report presents a starkly different accounting of this infraction.

Characterized specifically as Hoover "participating in an unauthorized meeting or gathering" (Code 315) and "being in an unauthorized area without staff authorization" (Code 316), the report relates that Hoover was standing near an access door, out of bounds, making an attempt to speak to another inmate, while the other inmate was on the opposite side of the door, laying on the ground, trying to talk under the crack in the door to be heard. Admittedly, Hoover walked out of bounds for this conversation, a moderate infraction, but the government amplifies it as the unauthorized conduct by two inmates discussing something gang related. This other inmate did not lay on the ground on the opposite side of a steel door out of reverence, but

17

apparently out of a longing to have a conversation with another person, a violation but not completely unsurprising given the scarcity of human contact. Hoover received 315 and 316 Moderate level infractions and loss of commissary for 15 days. He did not forfeit good time or non-vested good conduct time credit, ADX did not disallow him receiving good conduct time, he was not assessed a disciplinary transfer, he was not assessed disciplinary segregation, and statutory good time was not withheld.

The sanctions mentioned above are the only sanctions that ADX Florence has levied against Hoover. These sanctions are left to interpretation but it seems that just the mere mention of anything that touches anything about gangs or gang members in Chicago are considered "gang related," regardless of the context. There is no indication, however, Hoover was somehow engaged in directing gang activity, lest the sanction and Code violations would have been far more serious. The appropriate code violations would have been in the 100 level "Greatest Category," like Code 197 ("Use of Telephone to Further Criminal Activity"). But as shown, he only received one violation in the Greatest category and it was in 1999, over 20 years ago. Mr. Hoover's disciplinary record is based mostly as warnings and fines.

Notably, inmates housed at ADX may improve their conditions of confinement by seeking admission to the "Step-Down Program," a stratified system of less restrictive housing that incentivizes inmates to adhere to the prison's expectations of their conduct. (Ex. D, ADX 2018 Inspection Report Excerpt). The Step-Down Program is meant to prepare inmates to function in less restrictive conditions. Hoover, by function of him being in the Kilo Unit, is in the Step Down Program, and none of the infractions the Government claims to "have escalated in severity over time" since his highest infraction in 1999 has led the Bureau of Prisons to move him out.

It bears emphasizing that nothing in Hoover's disciplinary history supports a finding that in nearly 25 years of federal custody Hoover engaged in a pattern of attempting to conduct or influence the now defunct Gangster Disciples in any gang activity. ADX Florence's arbitrary designation of what is gang correspondence illustrates the fallaciousness of the conclusion, because the institution used it to deny legal mail from Hoover's attorney Justin A. Moore. On two separate occasions, Hoover was set to receive privileged mail regarding legal matters in which ADX Florence violated that privilege and curiously designated each package as "Gang Related Information" without detailing what aspect of the mail was gang related. (Ex. E, Returned Mail; Ex. F, Returned Mail). In August 2019, Hoover filed for a restraining order and other relief against the Bureau of Prisons and several staff members based on the opening of his legal mail and obstructing Hoover from communicating with his lawyer. (Ex. G, Complaint for Injunctive Relief). He is currently in the process of exhausting administrative procedures for the second violation so he can seek legal redress.

## C. Summary

The hierarchy of the Gangster Disciples detailed in the government's response was made defunct by a wide swath of federal criminal prosecutions and convictions over the last three decades, fulfilling the aims of dismantling the gang. As mentioned in Hoover's codefendant Johnny Jackson's reply to the governments same dubious assertions of the Gangster Disciple's existence, journalists, law enforcement officers, public policy makers, citizens, former gang members, and those currently involved in the business of drug sales in the City of Chicago, all can agree that the drug business in Chicago is no longer organized or dominated by structured groups with disciplined membership, common goals, or large numbers of adherents.

For example, at a conference hosted by the Great Cities Institute, University of Illinois, in 2019, researchers found that:

> Gangs in Chicago have changed dramatically in recent years, but our violence intervention strategies have not. The old hierarchical super-gangs, fighting citywide over control of drug trafficking, are largely gone. African American gangs have fractured into different types of cliques and neighborhood peer groups, affiliated more with rappers than with old gang chieftans.

J. Hagedorn, R. Aspholm, and T. Cordova, "The Fracturing of Gangs and Violence in Chicago: A Research-Based Reorientation of Violence Prevention and Intervention Policy." Those who attended this Conference agreed overwhelmingly and resoundingly that:

- Many African American gangs today are horizontally organized, neighborhood-based "cliques" that have little or no formal leadership structure; as a result, violence is more spontaneous and tends to be initiated by individuals, rather than ordered by gang leaders or hierarchies.

- Youth in neighborhood cliques are not "factions" of traditional gangs, as the Chicago Crime Commission (2018 Gang Book, p. 194) argues; they are entirely new and unique formations—rarely do such cliques have an formal relationships or connections among each other.

- The old People and Folks coalitions are almost completely defunct on the streets, and these traditional alliances have been replaced by affiliation to "families" of rappers.

- Interrupting the cycle of violence in horizontal relations-based cliques calls for methods and strategies of prevention and intervention different from those used to counter organized violence related to drug markets.

- Law enforcement strategies based on conspiracy-related prosecutions of gang leaders and members are out to date and counterproductive to horizontal cliques and how they operate.

When Hoover was taken into federal custody and ultimately convicted for drug offenses, Chicago was deeply entrenched in America's crack epidemic. The usage of crack since Hoover's

conviction has dramatically decreased. This country's opioid crisis now serves as the stand in for the sale of crack cocaine, which was the basis of Hoover's once alleged drug enterprise. Furthermore, the existence of the domestic drug trade has been profoundly diminished, with low level, retail end dealers going straight to foreign drug operations coming from Columbia, Mexico and China.

The Government continues to say that "that there is nothing to positive to say…" when discussing Hoover's participation in rehabilitative programming. In fact, Hoover has made significant strides toward rehabilitation during his incarceration even while set to spend the rest of his life in prison. Clearly, there is only so much Hoover could do to demonstrate his rehabilitation having spent the last 20-plus years in solitary confinement,   Still the positive comments from his family and close friends regarding Hoover's character, rehabilitative efforts, and high likelihood of re-entry success cannot be overstated.[5]  Hoover has demonstrated his commitment to turn his life around. His opportunity to prove to society he has learned from past mistakes should not be foreclosed upon.

Wallace "Gator" Bradley testified at a more recent trial. *See United States v. Darden, et al.*, 3:17-00124 (M.D.Tenn.). He is a former member of the Gangster Disciples who also went to prison for his criminal activities. (Ex. J, Bradley Tr. Pg. 34-36).  Pardoned by Governor Thompson in 1990, he went on to become a community liaison for a Cook County Commissioner and once went to the Oval Office where he met with President Clinton.  (*Id.* at 37, 43).  He discussed how he became a follower of Hoover's book, "From Gangster Disciple to Growth & Development," and he remains so to this day. (*Id.* at 39).  Although the Government

---

[5] (Ex. K, Winddye Hoover Letter; Ex. L, Briniya Hoover Letter; Ex. M, James Prince Letter; Ex. N, Larry Hoover, Jr., Letter; Ex. O, Benneth Lee Letter; Ex. P, Levon Stone Letter; Ex.Q Larry Bernard Hoover Letter; Ex. R, Dondi Jenkins Letter.

has always looked sideways at Hoover's book, Bradley testified it led him to change his life in positive ways. (*Id.* at 43-44). He testified that when Carol Mosely Braun was running to be the first African-American woman to be a United States Senator, they applied the concept of Growth and Development to help stop the violence so people could cross different lines and vote. (*Id.,* at 44). Bradley considered Hoover's message to be if you don't change your lifestyle you are going to "to end up in here like me" (*id.*, at 46), and that individuals need to stop killing one another. (*Id.*, at 47). Bradley dedicated his own book, "Murder to Excellence, Growth & Development to the Millennials," to Hoover. (*Id.*, at 60).

The Government may be skeptical, but the fact is that Hoover, even from behind bars, has been a positive influence on people and can do more if he is ever released. As Bradley noted, every conversation he has had with Hoover while the latter has been at ADX has been overheard by the prison. There is no way Hoover has spoken to anyone without the prison listening. (Ex. J, Bradley Tr. Pg. 77). The messages have always been positive. (*Id.,* at 78). Bradley rejected the Government's suggestion, repeated here, that Hoover's rehabilitation is a ruse, because

> that's something that he has been constantly saying. He didn't want to see his friends, grandchildren, or great grandchildren – the man has been locked up for nearly 50 years. So he's seen generations and generations of his friend's children and grandchildren, especially when he was in the Department of Corrections in Illinois, coming into the penitentiary.
>
> And so he felt the one thing he can tell them, learn from my experience of being locked away. *** You know, and that's the best that any of us can do that have been within the institution, it to let the young ones know that, hey, this is no joke. The mistake you make can lock you away for the rest of your life.

Ex. J, Bradley Tr. Pg. 79.

Hoover has been in prison 46 years and is now 69 years old. He has spent more than two-thirds of his life behind bars. He suffers from Type II diabetes. At almost 70 years old, he poses neither a significant public safety risk nor is he among the most serious and violent

offenders in the federal system. The sanctions over the last twenty years are left to interpretation; as noted earlier, the mere mention of anything involving a discussion about gangs in Chicago, even with the goal of eradicating gang violence or just mentioning old friends who renounced gang membership decades ago, and even legal correspondence from his lawyer, have been tossed onto a single pot demarcated as "gang related." Given that the prison listens and reads all Hoover's conversations (other than with lawyers), it is hard to imagine how Hoover could possibly get away with, or *think* he could get away with, communicating some kind of criminal activity, whether "coded" or otherwise. Bradley goes on to describe an incident where the Government solicited Hoover's help to do just the opposite. (*Id.*, at 49-50).

The fact is Hoover's disciplinary record consists of mostly warnings and fines. If he were to have involved himself in criminal conduct or attempting to influence illegal gang activity, the appropriate code violations would have been in the Code Level 100 level "Greatest" Category. As shown, he only received one violation in that category, in 1999, over 20 years ago. He has served 24 years in federal custody and done the best he could do given the confines of solitary confinement. Should the court agree that he qualifies under the First Step and Fair Sentencing Acts for a re-sentencing, Defendant will respectfully request that he be sentenced to time served on the CCE count and that any remaining sentences expire at the same time.

## CONCLUSION

Studies show that as age increases recidivism rates decrease, from 35.5% under age 21 to 9.5% over age 50.[6] At age 70, Mr. Hoover, who got married in prison (Ex. S), is unlikely to

---

[6] *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004), available at *http:www.ussc.gov/sites/default/files/pdf/research-and*

reoffend if released. For all the reasons stated in his original Motion, and the reasons stated above, Defendant respectfully requests the Court declare that he is eligible for relief under the First Step Act and to either order all his sentences to be converted to time served or, in the alternative, hold a hearing with respect to a reduction of his sentence.

Dated: May 29, 2020                            Respectfully submitted,
                                              LARRY HOOVER

                                 By:    /s/ Barry A. Spevack
                                        One of his attorneys

Michael D. Monico
mm@monicolaw.com
Barry A. Spevack
bspevack@monicolaw.com
MONICO & SPEVACK
53 West Jackson Blvd.
Suite 1315
Chicago, IL 60604
(P) 312-782-8500
(F) 312-759-2000

Justin A. Moore, ESQ
justin@moorejustice.net
1910 Pacific Avenue #8000
Dallas, Texas 75201
(P) 214-794-1069
(F) 972-228-8812

      Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

      Barry A. Spevack, an attorney, states that on May 29, 2020, Defendant's Reply Memorandum in Support of Relief Under the First Step Act was served on all parties through the Court's CM/ECF filing system, upon which all parties are registered users.

_publications/researchpublications/2004/200405_Recidivism_Criminal_History.pdf_

/s/  Barry A. Spevack
Barry A. Spevack
MONICO & SPEVACK
53 West Jackson Blvd.
Suite 1315
Chicago, IL  60604
312-782-8500
bspevack@monicolaw.com