1      IN THE UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

UNITED STATES OF AMERICA,        )
4                                )
                Plaintiff,       )
5                                )   No. 95 CR 508-1
           vs.                   )   Chicago, Illinois
6                                )   July 16, 2020
LARRY HOOVER,                    )   9:00 a.m.
7                                )
                Defendant.       )
8

9         TRANSCRIPT OF PROCEEDINGS - MOTION
                (Via teleconference)
10     BEFORE THE HONORABLE HARRY D. LEINENWEBER

11  APPEARANCES:
    For the Plaintiff:       UNITED STATES ATTORNEY'S OFFICE
12                           219 South Dearborn Street
                             Chicago, Illinois 60604
13                           BY:  HON. JOHN R. LAUSCH, JR.
                                  MR. GRAYSON SANG WALKER
14

15  For the Defendant:       MONICO & SPEVACK
                             20 South Clark Street, Suite 700
16                           Chicago, Illinois 60603
                             BY:  MR. MICHAEL D. MONICO
17                                MR. BARRY A. SPEVACK

18                           THE LAW OFFICE OF JUSTIN A. MOORE
                             1801 N. Hampton Road, #333
19                           DeSoto, Texas 75115

20

21

22

23  Official Court Reporter:  JENNIFER S. COSTALES, CRR, RMR
                              219 South Dearborn St, Room 2342
24                            Chicago, Illinois 60604
                              (312) 435-5895
25                            jenny.uscra@yahoo.com

1       (Proceedings via teleconference)

2           THE COURT:  Okay.  Everybody is present who needs to

3    be as far as participants is concerned?

4           MR. MONICO:  Yes, Your Honor.

08:57:37    5           THE DEFENDANT:  Good morning.  Good morning.  Larry

6    Hoover here.

7           MR. MONICO:  Hi, Mr. Hoover.  How are you, sir?

8           THE DEFENDANT:  Okay, fine.

9           MR. MONICO:  So I guess we're all here.

08:57:54   10           THE COURT:  All right.  So we're ready to proceed on

11   Mr. Hoover's petition for a resentencing.

12           This is Judge Leinenweber.

13           We sent out a (indiscernible) yesterday to indicate

14   that we are taking the position that I have the authority to

08:58:09   15   resentence him to something less than life.  And the issue is

16   whether I should exercise the discretion, basically.  I know

17   the government has disagreed and, hence, they're obviously,

18   they're privileged to do so.

19           I'd like to make a few opening comments.  As I

08:58:38   20   understand (indiscernible) I presided over the Hoover trial 25

21   years ago.  And probably a number of --

22           THE LAW CLERK:  Judge, this is Ben.  Can you hear me?

23           THE COURT:  Yes.

24           THE LAW CLERK:  I don't think the court reporter is

08:59:14   25   on yet, so we should wait a little bit until she logs on.

1          THE COURT:  All right.  Fine.

2          THE COURT REPORTER:  I am on.

3          THE COURT:  So in any event, I wish to make a few

4    opening remarks about what I think are some of the issues that

08:59:22    5    need to be addressed by both sides in this matter this morning

6    and then give a little background.

7          First of all, as you probably know, I presided over

8    the trial 25 years ago, and probably many of the people who

9    are hearing this were either in grade school or preschool at

08:59:46    10    the time.

11          Twenty-five years ago I sentenced Mr. Hoover to

12    mandatory life, which at the time was not discretionary.  The

13    appropriate guidelines changed (indiscernible) which gives us

14    flexibility rather than mandatory life.

09:00:18    15          The question is whether or not I should exercise

16    discretion and reduce his sentence to something less than

17    life.  And there is a few matters I'd like to bring up just

18    that I think are pertinent, and I would appreciate comments

19    from the participants.

09:00:36    20          Mr. Hoover has spent approximately 50 years in

21    prison, 25 in state custody and then the final, the last 25

22    under federal custody.  Federal took over once he was

23    convicted and sentenced 25 years ago.  And that's, therefore,

24    (indiscernible) behind the petition to sentence him, to

09:01:06    25    resentence him at the Colorado supermax facility.

1    One of the questions that has come up, if I

2    resentence him to time served for some other figure less than

3    life, at some point he would end his federal sentence.  My

4    understanding is he has substantial time left on his state

09:01:32    5    custody.

6        MR. MOORE:  That's true, Judge.

7        THE COURT:  What is his out date under state custody?

8        MR. MONICO:  Justin, are you there?

9        THE COURT:  What?

09:01:51    10    In any event, the practical effect would be, unless

11    the state took efforts to reduce his sentence, custody of the

12    defendant at the supermax, but he would be in...

13    (interference/feedback)

14        UNIDENTIFIED SPEAKER:  Hello?

09:02:21    15    (Interference/feedback)

16        UNIDENTIFIED SPEAKER:  Put your phone on mute.  Put

17    their phone on mute.

18        THE COURT:  Can everybody hear me?

19        MR. MONICO:  I can hear you, Judge.  But I think

09:02:39    20    other people who are on, if they can put their phone on mute.

21        UNIDENTIFIED SPEAKER:  Yes, sir.

22        UNIDENTIFIED SPEAKER:  I can't hear nothing.

23        UNIDENTIFIED SPEAKER:  Everybody put their phone on

24    mute.  Put your phone on mute.  Put your phone on mute.

09:02:53    25        THE COURT:  The decision to send him to supermax was

not mine.  It was an executive function.  And where he carries

out his federal sentence is up to the executive branch of

government.  I was not privy to the reasons they sent Hoover

to (indiscernible), but there existed some reasons which I

(indiscernible) the request.

First of all, the state penal system was rife with

problems.  The inmates were allowed much leeway at that

particular time.  The guards who came from the gang

neighborhoods were subject to pressure from gang members on

the outside.  The administration, the administrators at

various times actually used gang members is my understanding

to help maintain order in return for certain benefits.

The fact is that Hoover, who was, when he was

arrested by the Feds, was in state custody and his cell was

rife with contraband including shoes.  And I can recall that

the government called as a witness a shoe store owner, who

testified to the value of the shoes that Hoover had, a

crocodile pair and an alligator pair, plus he had a huge

amount of other contraband.

So it would appear that purposes of supermax was so

that Mr. Hoover would not be able to run the penal system and

benefit from it.

Some of the questions I have which I'd like to have

responded to, Hoover in his filing indicated that based upon

some studies that the gang structure in Chicago is vastly

09:05:40

09:06:06

09:06:32

09:06:56

09:07:17

1   different today than it was 25 years ago.  Gangs seem to be

2   smaller, not necessarily less vicious, but smaller in number.

3   And the question is, are state prisons more secure than they

4   were 25 years ago?  And are guards, for example, still able to

5   supply contraband to inmates?  And basically can the state

6   handle Hoover?

7        So those are some of the questions, whether or not,

8   for example, if I make it possible for him to leave supermax

9   and go to state, he will obviously be under strict penal code,

10  and is that doable?

11       So those are some of my initial observations.  I'd

12  just ask maybe Mr. (indiscernible) at first on some of the

13  questions I have, if that would be okay.

14       MR. MONICO:  Justin, are you there?

15       MR. MOORE:  Yeah, I'm here.

16       MR. MONICO:  So I think, I think you are correct,

17  Judge, that he would be, he could be put in state custody.

18  And he's facing a life sentence in state custody.  And by now

19  the state is going to be fully aware of who he is.  He's 70

20  years old.  For the last -- by the way, Judge, one thing we

21  made an error in our reply, we said that he has had a hundred

22  hours of education.  He's done a thousand hours of education

23  and doing a hundred different courses.

24       So the point is this, he is certainly at an age when

25  he is no longer a threat.  He's no longer at risk of causing

any difficulty in prison.  For the last 25 years he's been in

solitary confinement, where he's by himself for the last 20

odd, 24 hours a day -- 23 out of 24 hours in a room that's 12

by 17.  So he has suffered.  He has made the best of his

09:07:46  prison sentence by doing a thousand hours of education.

And, Justin, are you there?

UNIDENTIFIED SPEAKER:  Just what he said, that's a

lie.  He got a thousand hours of education.

MR. MONICO:  That's what we just said, a thousand

09:08:06  hours.

THE COURT:  That's reasonably impressive.  He would

be going crazy locked (indiscernible)

MR. MONICO:  Yeah.  And this is a man who was

practically dyslexic and unable to read when he entered

09:08:26  prison.

Justin?

MR. MOORE:  Judge, may I?

MR. MONICO:  Go ahead.

THE COURT:  Go ahead.

09:08:38  MR. MOORE:  So what you mentioned, Your Honor, is

important to note.  Mr. Hoover has been behind bars for nearly

50 years, in the last 25 years in some form of severe

isolation in the most secure prison in the world.

And taking your concerns to heart, and I think they

09:08:59  are valid concerns, and I think we can rest assured those

1    concerns by setting that (indiscernible) this year was spent a

2    quarter (indiscernible) in isolation, I believe he has been

3    chastened by that.

4         And whatever conduct that led him to be in isolation

09:09:17    5    in that, in those conditions, I would almost guarantee you, I

6    would guarantee you that he would do anything in his power to

7    avoid being sent back to.  If he can't be chastened by 25

8    years of isolation, I don't know what can chasten you against

9    violating the rules or whatever position that you might find

09:09:37    10    yourself in.

11         UNIDENTIFIED SPEAKER:  Look at this.  Come here.

12         MR. MOORE:  So I think it's important to acknowledge

13    the severe conditions that he's had to suffer under.  And to

14    be quite honest, you know, and I don't want to speculate about

09:09:49    15    Mr. Hoover's mental state, but I do believe if he is released

16    from isolation, he's going to carry the weight (indiscernible)

17         MR. WALKER:  Judge, this is Grayson Walker for the

18    United States.

19         Can I respond to your specific questions and also

09:10:06    20    more generally to the motion?

21         UNIDENTIFIED SPEAKER:  My bad.

22         THE COURT:  Go ahead.

23         MR. WALKER:  Judge, thank you.  So on your first

24    comment that Hoover has spent approximately 50 years in

09:10:24    25    prison, I would urge you to just look down behind that raw

1  number into the substance of what's happened during that

2  50-year period.

3          So for approximately half (indiscernible) --

4          UNIDENTIFIED SPEAKER:  Come here, boy.

09:10:35  5          MR. WALKER:  -- from 1974 to 1995, he was running the

6  gang from state prison.  So those years that he served in

7  custody are not normal punitive years in custody that the

8  defendant served.  He was actively, he was actively committing

9  the crime --

09:11:01  10          UNIDENTIFIED SPEAKER:  Hurry up and don't be late.

11          MR. WALKER:  Judge, can you ask everyone on the line

12  except counsel to please mute their phones.

13          THE COURT:  Go ahead, counsel.

14          MR. WALKER:  Thank you, Judge.

09:11:18  15          I'm making the point that Larry Hoover, although he

16  has been in custody for 50 years, was actively committing

17  crimes for approximately half of that time.

18          So (indiscernible) he has potentially been sitting in

19  custody --

09:11:36  20          THE COURT:  I would like to make a comment on that

21  comment.  I understand that he was --

22          MR. MOORE:  Hello.  Hello.  I got booted off the

23  call.  I'm sorry.  This is Justin Moore.

24          THE COURT:  Can you hear me?  Can you hear me?

09:11:50  25          MR. MONICO:  Yes, Judge.

|       |     |                                                              |
|-------|-----|--------------------------------------------------------------|
|       | 1   | THE COURT:  He was, obviously, it's almost humorous          |
|       | 2   | the way that, you know, he was running the gang down to      |
|       | 3   | Vandalia people from Chicago, and his nine governors went -- |
|       | 4   | UNIDENTIFIED SPEAKER:  Hi, ma'am.  This is the               |
| 09:12:22 | 5 | company PCP (indiscernible)                                 |
|       | 6   | THE COURT:  This is not going very well.                     |
|       | 7   | Anyway, he's able to run it, and my sense is                 |
|       | 8   | (indiscernible) (overlapping speakers)                       |
|       | 9   | UNIDENTIFIED SPEAKER:  This call may be monitored or         |
| 09:12:28 | 10 | recorded for quality.  (Indiscernible) in reference to your |
|       | 11  | loan (indiscernible).  Are you able to make your payments    |
|       | 12  | today?                                                        |
|       | 13  | UNIDENTIFIED SPEAKER:  Could everyone please put             |
|       | 14  | themselves on mute, other than the Judge and the attorney who |
| 09:12:54 | 15 | is speaking right now.  Please put yourself on mute.        |
|       | 16  | UNIDENTIFIED SPEAKER:  Can you hear me?                      |
|       | 17  | THE COURT:  Hello.  This is the Judge again.  I              |
|       | 18  | wanted to make the point that he was able to run --          |
|       | 19  | UNIDENTIFIED SPEAKER:  Okay.  Would you like to set          |
| 09:13:03 | 20 | up an arrangement now or --                                 |
|       | 21  | THE COURT:  He was able to run the gang from                 |
|       | 22  | prison --                                                    |
|       | 23  | UNIDENTIFIED SPEAKER:  I'm sorry?                            |
|       | 24  | THE COURT:  This is not working out very well.               |
| 09:13:32 | 25 | Hello?                                                      |

1          UNIDENTIFIED SPEAKER:  I'm sorry?

2          UNIDENTIFIED SPEAKER:  Ma'am, could you please put

3    yourself on mute while the Judge and the attorneys are

4    speaking, please.

09:13:41    5          Would others please put themselves on mute while the

6    Judge and the attorneys are speaking, please.

7          UNIDENTIFIED SPEAKER:  You are going to have another

8    arrangement for the hardship.  Okay.  At this time are you

9    working?

09:13:59    10          THE COURT:  I am hearing other voices.

11          UNIDENTIFIED SPEAKER:  Okay.  We can place your

12   account for hardship.  Once your account is in hardship,

13   collections will be (indiscernible) --

14          THE LAW CLERK:  Judge, can you hear me?  This is Ben.

15          UNIDENTIFIED SPEAKER:  -- to better understand the

16   current situation and allow the resolution department to

17   customize a repayment --

18          THE LAW CLERK:  Judge?

19          THE COURT:  Yes.

09:14:26    20          THE LAW CLERK:  Melanie is working to figure

21   something out.  Can you hold on for a second.

22          THE CLERK:  Okay.  If everyone other than the Judge

23   and the attorneys, please mute your phones so we can hear

24   (indiscernible) we will have to move forward with only the

25   Judge and the attorneys.  So please, please, please, and so we

1  can record an accurate transcription, please

2  (interference/feedback)

3          THE COURT:  Hello?  Are we back?

4          THE CLERK:  Yes, sir.

09:15:21    5          THE COURT:  Can you hear me?

6          THE CLERK:  Yes, Judge, we can hear you.

7          THE COURT:  I said my point, my point was that he was

8  able to do that because of the state correctional system was

9  being run at the time.  And my question is, has the state been

09:15:39   10  able to get a hold of their system in a much better way than

11  they did 25 years ago?  Because it was in fact, as I said, Mr.

12  Hoover had dollars and contraband in his cell as he had been

13  for presumably years, and he was allowed, and I guess he had

14  conjugal visits while he was incarcerated.

09:16:05   15          So the question is, does the state have a better, you

16  know, a better system now?  My guess is that they do, but I'd

17  like to know whether or not the government is --

18          MR. WALKER:  Judge, this is Grayson Walker on behalf

19  of the United States.  I'd make a few points in response to

09:16:24   20  your question.

21          There is no record evidence here of what the control

22  and security procedures are in IDOC currently and how those

23  compare to the 1974 to 1995 period when Hoover was committing

24  these crimes from IDOC facilities.

09:16:44   25          So at this point, respectfully, it would be pure

1  speculation to make a prediction about what -- whether Hoover

2  returning to IDOC presents a risk of recidivism or not.  And

3  for reasons that I'm happy to discuss in more detail, there

4  are strong reasons to leave his sentence in place given its

09:17:10  5  general deterrent value and the need to promote respect for

6  the law.

7       So I would respectfully submit that attempting to

8  assess current conditions in IDOC should not be the

9  determining factor on whether to grant him First Step Act

09:17:27  10  relief.

11       THE COURT:  Actually, well, I think certainly it

12  would bear in my mind if I, you know -- and certainly it seems

13  to me that we can find out how the system is being run now.

14  If it's as bad as it was, then that's one thing.  If they've

09:17:46  15  straightened it up, that's entirely another thing.  So I think

16  the safety of the people, obviously, is one of the hallmarks

17  of the system.

18       So the fact that we don't know doesn't necessarily

19  mean we can't find out.  Now, I would be certainly interested

09:18:05  20  in what the situation would be, for example, with respect to

21  state custody, is he going to get one of the (indiscernible)

22  as he did 25 years ago or is he going to be -- so that's a

23  question I'm very interested in an accurate response.  Whether

24  it's possible to get an accurate response, I don't know, but I

09:18:32  25  would think people must be studying the --

1        MR. MOORE:  Judge, Judge, might I, might I add, I

2  think your, I think your question is important.  So are the

3  parameters and is the apparatus of the Illinois Department of

4  Corrections suitable for someone like Mr. Hoover.

09:18:55    5        THE COURT:  Right.

6        MR. MOORE:  I do believe your question is premised on

7  who Mr. Hoover used to be, not who he is today.  I think the

8  past 23 years of isolation, the fact that he's been placed in

9  the most desirable program in that prison, the Stepdown

09:19:11  10  Program, which is designed for inmates that have shown

11  themselves and have availed themselves of all of the programs

12  in that institution --

13        UNIDENTIFIED SPEAKER:  B Boy, open the door real

14  quick.

09:19:18  15        THE CLERK:  Okay.  Everyone, please mute yourselves.

16        MR. MOORE:  But with him being in the Stepdown

17  Program, it has actually indicates directly and explicitly

18  that he is prepared to be moved into a prison with lesser

19  restrictions.

09:19:40  20        So even, even if, even if, even if we didn't -- even

21  if we weren't going through this Step First Act process, he

22  would be prepared to be released maybe eventually due to him

23  being in that Stepdown Program.

24        Also, if we're talking about safeguards and

09:19:57  25  preventative measures from him receiving contraband and things

1  that he shouldn't be receiving in state prison, you've got to

2  look at the nature and how -- the nature of his former

3  organization and how it possibly could be constructed today.

4  I mean, all of his friends, people that were close to him,

09:20:14  5  they all reached -- they have all grown in age with

6  (indiscernible)

7  Mr. Hoover is a man that is reaching 70 years old

8  this year. All of his friends are in that age group as well.

9  A lot of them have either aged out of criminal conduct,

09:20:31  10  unfortunately, they have either passed away, or the ones that

11  are still living, they're involved in legal businesses and

12  community development programs.

13  So I think, I think the connection to the community

14  and the connection in which he would receive illegal

09:20:47  15  contraband is almost nonexistent. One is definitely failing

16  -- it fails in stark comparison to how it existed 25, 30 years

17  ago. So I do believe that wouldn't be an issue, especially

18  given the fact that Mr. Hoover has been chastened by

19  isolation.

09:21:04  20  I don't think he would want to go back to those

21  conditions and I don't think he would risk going back into

22  those conditions over a pair of shoes or a conjugal visit.

23  This is a man who hasn't touched his grandchildren,

24  hasn't kissed his granddaughter, hasn't hugged his grandson.

09:21:20  25  He hasn't been able to provide his son or his sons with a warm

1    embrace.  He hasn't even been able to kiss his wife.

2         I mean, he just got, he just got legally married to

3    his common law wife earlier this year.  He hasn't even been

4    able to provide her a kiss or give her a hug.  It was in

09:21:38    5    consummating that process that they've been trying to

6    consummate over the past 50 years.

7         So I think Mr. Hoover is a person that understands

8    where he's at.  And I really believe, I truly believe that he

9    does not want to go back to the hell that he's in currently.

09:21:55    10         So, you know, Illinois Department of Corrections

11    notwithstanding, I do believe they have had to have upgraded

12    their facilities and their process and procedure, just as a

13    matter of them having liability for, you know, the people that

14    they have in custody today.

09:22:10    15         But I do believe Mr. Hoover by himself as a matter of

16    self-responsibility is, you know, in the best position

17    possible to govern himself and to ensure that he won't commit

18    the same acts that he committed 25, 30 years ago.

19         THE COURT:  Again, I would like some kind of an

09:22:34    20    opinion from a group or whatever to make an assessment of the

21    current --

22         MR. MONICO:  Conditions in state court, state prison,

23    Judge?  Why don't we, why don't we do this and give us two

24    weeks to report back to Your Honor on this issue.

09:22:56    25         MR. WALKER:  Judge, this is Grayson Walker for the

United States.

I can tell you based on the conversations I've had with IDOC personnel, they do not want Mr. Hoover to return to an IDOC facility. Moving him from ADF Florence to IDOC would just wreak havoc within both BOP and IDOC.

And as I said a moment ago, and I would like to be heard on this for a few minutes now, I think there are strong reasons to leave this sentence in place, even if it's possible that he would go back to IDOC custody on strong -- under stronger control than when he was able to commit this crime.

There are just few if any defendants in the federal system who are less deserving of a sentence reduction than Larry Hoover. From state prison, where he was already serving a 150 to 200-year sentence for murder, he ran a violent street gang for more than two decades that had more than 10,000 members and terrorized entire neighborhoods with drugs and violence. He was the unquestioned leader of that gang and he received a life sentence from this Court.

And the government strongly submits that life imprisonment is the only appropriate sentence for a defendant like Larry Hoover, and that's because of the seriousness of his offense conduct, his criminal history, his conduct within BOP custody - and I'd like to respond to a few points counsel made on that score - and the important need to promote respect for the law and general deterrence here.

1       So the reason Larry Hoover was in IDOC custody in the

2   first place is that he ordered a murder of a low-ranking

3   member of the gang, William Young, 19 years old, in 1973

4   because of suspicion that Young was stealing from one of

09:24:50   5   Hoover's stash houses.

6       So he got a 150 to 200-year state sentence, and he

7   didn't reform and he wasn't deterred by that sentence.

8   Instead, from a state prison, he consolidated power and became

9   the unquestioned leader of the Gangster Disciples, an enormous

09:25:08   10   gang which is organized in a strict hierarchy of roles.  And

11   Mr. Hoover was at the very top calling the shots.  All the

12   power in the gang flowed down from him.

13       The gang was violent, and it made massive profits

14   from drug dealing.  By Hoover's own admission in taped

09:25:26   15   conversations, the daily profits from drug dealing were

16   $300,000, which translate to over $100 million in drug profits

17   per year.  Those are staggering numbers viewed from the

18   standpoint of even a single day or a single year.

19       But Hoover was the leader of this gang for decades.

09:25:46   20   So it's through his drug dealing and his violence that he was

21   directing from state prison, he did more damage to the city of

22   Chicago than perhaps any other person in recent decades.  He

23   used teenagers and young men to sell his drugs, and he had

24   them murdered, beaten or otherwise violated if they stepped

09:26:06   25   out of line.

1    He wrecked the lives of those young men and their

2    neighborhoods, and he did it all for his own personal profit

3    and under the scam which the Court heard extensive evidence

4    about at trial, that the GDs were about growth and development

09:26:24   5    rather than their true purpose, which was drug dealing and

6    violence.

7    So Hoover is an expert at manipulating and committing

8    crimes through other people.  The risk of recidivism and the

9    need to protect the public from future crimes remain live

09:26:41   10   concerns in this case.  And reducing Larry Hoover's sentence

11   is just about the last thing that the city of Chicago or the

12   nation needs right now.

13   And I want to talk about his conduct while in BOP

14   custody.  At this point Mr. Hoover has proffered that he's

09:26:59   15   completed approximately 1,000 hours of education over the last

16   20 years.  That translates to an annual average of about 50

17   hours or slightly more than one full-time work week per year.

18   So that's what he's offering in the way of rehabilitation.

19   But look at his other conduct while he's been in BOP

09:27:22   20   custody, the violations that are described with supporting

21   documentation in the government's response to his motion.

22   In '97, he threatened to destroy property.

23   I'm sorry, Judge, did you have a question?

24   THE COURT:  (Indiscernible) all of those because

09:27:43   25   (indiscernible) the defendants (indiscernible)

1          MR. WALKER:  Yes.  And the key point on those BOP

2  violations, Judge, is that some of them are quite recent, from

3  2015 and 2017, where he's engaged in unauthorized and coded

4  communication that appear to relate to gang business.  And

09:28:06     5  this shows that, at a minimum, Larry Hoover is still a

6  symbolic figure nationally within the world of street gangs.

7          His sentence in this case, the federal case, really

8  matters, and it has the power almost uniquely among federal

9  sentences to send a strong deterrent signal against gang

09:28:32    10  violence.

11          And on the flip side, to reduce his sentence simply

12  because 25 years have passed and he's taken some educational

13  classes in BOP would do serious damage to the rule of law and

14  public safety.

09:28:47    15          Nearly every gang member in Chicago even if they were

16  not born during Larry Hoover's reign knows his name.  He's the

17  famous chairman of the Gangster Disciples.  And if he gets a

18  break on his federal life sentence, not because the law

19  required that result or because any evidence in the case has

09:29:08    20  changed or because he has a spotless disciplinary record in

21  prison or because he has achieved substantial rehabilitation,

22  but just simply as a matter of judicial lenience and a

23  prediction about whether IDOC can handle him, the lesson to

24  gang members today will be that there is no need to fear

09:29:30    25  federal prosecution or the prospect of a life sentence and

1    that federal punishment for the kinds of crimes that Hoover

2    committed is not definite or not certain, because not even the

3    likes of Larry Hoover, the worst of the worst, ultimately had

4    to serve his federal life sentence.

09:29:46    5    So for all those reasons, Judge, the government

6    respectfully but strongly urges you to deny Mr. Hoover's

7    motion under the First Step Act and leave his sentence in

8    place.

9    THE COURT:  Mr. Hoover is required to give a brief

09:30:02    10   rebuttal and then --

11   MR. MOORE:  Yes, yes, Judge.  Thank you.

12   Some of the most important points that Mr. Walker

13   mentioned deal with this, quote-unquote, gang activity or

14   engaging in gang conduct.

09:30:17    15   I think it's important to note for 16 straight years

16   Mr. Hoover did not receive any infractions from probably the

17   most intense when it comes to zero tolerance --

18   UNIDENTIFIED SPEAKER:  Get your argument on.

19   MR. MOORE:  That's an important, that's an important

09:30:33    20   hallmark (overlapping speakers) --

21   UNIDENTIFIED SPEAKER:  Get your argument on.

22   MR. MOORE:  -- for the record.  Sixteen years is a

23   substantial amount of time without an infraction.

24   The first infraction after those 15 years came when

09:30:45    25   there was one new guard that came into that institution who

from what it seems had great career aspirations. And she came into that institution with the notion that if she is extremely rigid, Machiavellian in her approach, that she would be able to climb the ladder of that institution rapidly.

So that's when we started seeing these gang communication infractions, which ultimately amounted into slaps on the wrist, because he never received any good-time credit being taken away from him. So he's maintained all of his good-time credits since 1999, which I believe is a barometer for stating and showing of a person as not being or not adhering to institutional policy, that you can receive an infraction, but you've got to read deeply into the reasons for those infractions and the punishment that's been issued behind them.

If you look at those infractions, they state that a mere warning is only necessary to provide to Mr. Hoover in order to ensure that he wouldn't partake in these acts again. And he's never received anything greater than just the notion of those infractions.

So let's talk about the gang communications for a bit. And this is why what we placed in our motion, what we state in our motion explicitly, those infractions are frivolous.

I sent Mr. Hoover two legal correspondences by mail. And I received them back, and they were, they were, they were

09:32:24

1    notated as gang correspondence.  Now, I'm not a gang member.

2    I've never been one.  I've never been sworn in as one.  I've

3    never aspired to be one.  But my correspondence with my client

4    has been labeled a gang correspondence.  If that doesn't show

5    the frivolity of how they placed these notions and labels on

6    his communications, I don't know what does.

7            Everything this man says is construed as gang

8    communication.  He can't open his mouth without it being

9    labeled as such.  He is imprisoned by that label, and I think

09:32:42

10   he knows that.  We talk about it all the time, if I'm allowed

11   to get a bit personal.  It's really frustrating that he can't

12   speak to his wife, his kids or even his attorney without his

13   (overlapping speakers) --

14           UNIDENTIFIED SPEAKER:  I moved over.  I'm moving them

15   over.

16           MR. MOORE:  Excuse me, please mute your phone if

17   you're not an attorney.

18           UNIDENTIFIED SPEAKER:  (Indiscernible) damn, man

19   (indiscernible)

20           UNIDENTIFIED SPEAKER:  Put your phone on mute.

21           MR. MOORE:  Sorry, Judge, I lost my train of thought.

22   But I think it's important to realize that these gang

23   communications that Mr. Walker is trying to highlight as the

24   reason for Mr. Hoover's, you know, continued efforts of

09:33:17

25   running a gang, I think it's (indiscernible) and you should

1    follow that here based on the points I just provided.

2         Also, it's important to continue hammering home the

3    point that 23 years in severe isolation, that is great -- that

4    is probably the second greatest punishment a person can

09:33:33  5    receive in this country outside of being sentenced to death.

6         And throughout those 25 years, Mr. Hoover never

7    thought he would get out of prison.  So the fact that he

8    partook in these great rehabilitative efforts, the fact that

9    he spent a decade and half not racking up any infractions at

09:33:52  10    all, and he wasn't really, he wasn't really provided the

11    impetus to think that if I act like a great inmate I will be

12    released one day, because he never thought he would ever be

13    released.  He was doing this because he's actually

14    rehabilitated.

09:34:05  15         This man is 70 years old (indiscernible)

16    (interruption/feedback)

17         MR. MOORE:  -- the Parole Board and petition them for

18    an ultimate reprieve, he has the ability to be a model

19    citizen.

20         UNIDENTIFIED SPEAKER:  Hello?

21         MR. MOORE:  Can you guys, can you guys please mute

22    your phone.

23         THE COURT:  Hello.  Anyway, I think I got the

24    picture, so we'll take this matter under advisement.  I

09:34:43  25    actually would like for each side to file something what their

1    (indiscernible) (overlapping speakers)

2         MR. MONICO:  Judge, excuse me.  Judge, because of the

3    difficulty of this phone call, possibly if we could have two

4    or three weeks to respond to your questions about whether the

09:35:07    5    Illinois Department of Corrections has improved.

6         UNIDENTIFIED SPEAKER:  He running Gangster Disciples

7    where they say he's running -- he didn't deal for life.  They

8    got him on trial trying --

9         UNIDENTIFIED SPEAKER:  Put your phone on mute, damn.

10         UNIDENTIFIED SPEAKER:  Put your phone on mute.

11         UNIDENTIFIED SPEAKER:  Mute your phone.  Can you all

12    please just mute your phone.  Just mute your phone, man.

13         UNIDENTIFIED SPEAKER:  We're trying to hear the Court

14    here, not y'all talking.

09:35:30    15         UNIDENTIFIED SPEAKER:  They say he ran things, he

16    started --

17         THE COURT:  Two weeks each side.

18         UNIDENTIFIED SPEAKER:  Mute your phone.  Press mute.

19    Press mute.

09:35:47    20         UNIDENTIFIED SPEAKER:  Please respect this man and

21    mute y'all phones, please.

22         THE COURT:  All right.  Shut off your cellphones.

23    All right.  Can everybody hear me?

24         MR. MONICO:  Yes, Judge.

09:35:56    25         MR. WALKER:  Yes, Judge.

|   |   |
|---|---|
| 1 | THE COURT:  All right.  File a memorandum contesting |
| 2 | that -- assume that I am going to sentence (indiscernible) and |
| 3 | also to include the reasons, summary reasons why I shouldn't |
| 4 | do anything, okay. |
| 5 | MR. MONICO:  Yes, Your Honor. |
| 6 | MR. WALKER:  Yes, Your Honor. |
| 7 | MR. MONICO:  Thank you, Judge. |
| 8 | MR. WALKER:  Judge, this is Grayson Walker. |
| 9 | Before we adjourn today, the U.S. Attorney John |
| 10 | Lausch is appearing with me by phone today and would like to |
| 11 | briefly address the Court, if that's okay. |
| 12 | THE COURT:  I've got to listen to him. |
| 13 | MR. LAUSCH:  Thank you, Your Honor.  I would just |
| 14 | like to comment very briefly.  Mr. Walker, I reiterate all of |
| 15 | his points, which were very well stated, and to comment in |
| 16 | response to one of the points that was just made. |
| 17 | The very reason that Mr. Hoover is in isolation is |
| 18 | based upon his present dangerousness and ongoing |
| 19 | dangerousness.  And it simply makes no sense now to give him a |
| 20 | chance to run the Gangster Disciples or any remnants of the |
| 21 | Gangster Disciples from the IDOC. |
| 22 | It's our sincere belief that it would be a |
| 23 | miscarriage of justice to reduce his sentence in any way, |
| 24 | shape or form.  And we're happy to submit any additional |
| 25 | material.  And thank you, Your Honor. |

09:36:17 (line 5)
09:36:27 (line 10)
09:36:44 (line 15)
09:37:01 (line 20)
09:37:17 (line 25)

27

1          THE COURT:  Thank you all for participating.  And I

2     will rule on it at some point in the near future.

3          MR. MONICO:  Thank you, Judge.

4          MR. WALKER:  Thank you, Judge.

09:37:35    5       (Proceedings concluded)

6                   C E R T I F I C A T E

7          I, Jennifer S. Costales, do hereby certify that the

8     foregoing is a complete, true, and accurate transcript to the

9     best of my ability of the proceedings had in the

10    above-entitled case before the Honorable HARRY D. LEINENWEBER,

11    one of the judges of said Court, at Chicago, Illinois, on

12    July 16, 2020.

13

14                        */s/ Jennifer Costales, CRR, RMR*

15                        Official Court Reporter

16                        United States District Court

17                        Northern District of Illinois

18                        Eastern Division

19

20

21

22

23

24

25